## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VENANCIO AGUASANTA ARIAS AND ROSA TANGUILA ANDI, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, husband and wife on behalf of themselves, as guardians of their four minor children, and on behalf of all others similarly situated; ESTER INEZ ANDI, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, on behalf of herself, as legal Guardian of her minor child, and on behalf of all others similarly situated; | |
| | C.A. No: |
| SANTIAGO DOMINGO TANGUILA ANDI AND LAURA SARITAMA, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, husband and wife of Quechua nationality on behalf of themselves, as legal Guardians of their two minor children, and on behalf of all others similarly situated; | CLASS ACTION COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES; JURY TRIAL DEMANDED |
| VIDAL CAMACHO AND DEICY LALANGUI, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, husband and wife, on behalf of themselves, as legal guardians of their four minor children, and on behalf of all others similarly situated; | |
| JOSE CASTILLO AND BETHY SAN MARTIN, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, husband and wife, on behalf of themselves, as legal guardians of their three minor children, and on behalf of all others similarly situated; | |
| JOFRE JIJON ALVARADO AND ENMA PEÑA, La Comunidad San Franciso 2, Province of Sucumbios, Ecuador, husband and wife, on behalf of themselves, as legal guardians of their minor child, and on behalf of all others similarly situated | |
| Plaintiffs, | |
| v. | |
| DYNCORP 11710 Plaza America Drive Reston, Virginia 20190 | |
| DYNCORP AEROSPACE TECHNOLOGY DYNCORP TECHNICAL SERVICES, LLC DYNCORP INTERNATIONAL, LLC One Ridgmar Centre 6500 West Freeway, Suite 600 Forth Worth, TX 76116 | |
| Defendants. | |

## I. INTRODUCTION – NATURE OF THE ACTION

1. Plaintiffs Venancio Aguasanta Arias and Rosa Tanguila Andi, husband and wife, on behalf of themselves and as legal guardians of their four minor children, and on behalf of all others similarly situated;  Ester Inez Andi on behalf of herself, and as legal guardian of her minor child, and on behalf of all others similarly situated; Santiago Domingo Tanguila Andi and Laura Saritama, husband and wife, on behalf of themselves and as legal guardians of their two minor children, and on behalf of all others similarly situated; Vidal Camacho and Deicy Lalangui, husband and wife, on behalf of themselves and as legal guardians of their four minor children, and on behalf of all others similarly situated; Jose Castillo and Bethy San Martin, husband and wife, on behalf of themselves and as legal guardians of their three minor children, and on behalf of all others similarly situated; Jofre Jijon Alvarado and Enma Peña, husband and wife and on behalf of themselves and as legal guardians of their minor child, and on behalf of all others similarly situated (hereafter collectively referred to as "Plaintiffs" unless otherwise specified) bring this Complaint for equitable relief and for damages to remedy the injury to their persons inflicted by the actions described herein of Defendants DynCorp ("DynCorp"), DynCorp Aerospace Technology ("DynCorp AT"), DynCorp Technical Services, LLC ("DynCorp TS"), and DynCorp International, LLC ("DynCorp Int'l")  (hereafter collectively referred to as the "DynCorp Defendants" or "Defendants" unless otherwise specified).

2. This is an action for declaratory judgment pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, *et seq.*, as well as for compensatory and punitive damages, and injunctive relief. The claims in this action arise from the DynCorp Defendants' conduct in connection with the implementation of their contract with agencies of the U.S. government to exterminate, by use of fumigants sprayed from airplanes,  plantations of cocaine and/or heroin poppies in large tracks of the Colombian rainforest owned by private citizens of Colombia.  During the course of

implementing this contract, Defendants also sprayed large sections of Ecuador that border with Colombia, and caused severe physical and mental damage to Plaintiffs, their children, and other similarly situated lawful residents of Ecuador who have nothing whatever to do with the production of illegal drugs in Colombia. Plaintiffs have been subjected to serious human rights abuses, including systematic damage to their persons and their property, torture, extra judicial killing and crimes against humanity in violation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350, the Torture Victims Protection Act ("TVPA"), 28 U.S.C. §1350 (note), international human rights law, and the statutory and common tort law of the District of Columbia.

3. Plaintiffs will not have access to full and complete judicial relief if their claims are brought in Ecuador since Defendants, their records and other evidence, most material witnesses, and Defendants' assets are located in the United States. Further, the DynCorp Defendants have no judicial presence in Ecuador and personal jurisdiction would not be possible. Their contract to conduct the aerial spraying described herein does not authorize them to spray in or otherwise do business in Ecuador. Thus a lawsuit for the causes of action alleged in this Complaint cannot be brought in Ecuador. Finally, Law 55 in Ecuador prevents citizens who have filed an action against a defendant in a foreign jurisdiction from re-filing the case in Ecuador after a forum non conveniens dismissal by the foreign forum. Thus, if this case is not allowed to proceed in this Court, Plaintiffs will have no forum in Ecuador.

4. Regardless of legal concerns described in ¶ 3, if Plaintiffs bring their Complaint in Ecuador, they would face certain retribution and punishment from interested private parties and operatives of the Government of Colombia, including paramilitary forces, who do not want any inference with their efforts to expose and eliminate guerilla forces allegedly involved in the production of illegal drugs in Colombia. Further, the case should be heard in the United States

because it would be dangerous for counsel for Plaintiffs (and for defendants), as well as for other material witnesses who would have to travel to Ecuador for a trial. The Ecuadorian government does not guarantee the security of individuals traveling through the border zone with Colombia, especially foreigners. There is guerilla activity on both sides of the Colombia-Ecuador border. The United States Department of State has published a travel advisory warning for the region which states as follows:

> **SAFETY AND SECURITY:** *The U.S. Embassy in Quito advises against travel to the northeastern sector of the country, especially the provinces of Sucumbios, Carchi, and Orellana that border on Colombia. The frontier areas of these provinces are especially dangerous because of the significant increase in common crime, extortion, and kidnapping. Since 1994, ten U.S. citizens have been kidnapped near the Colombian border. Law enforcement along the border has difficulty containing the spread of organized crime, drug trafficking, and armed insurgency, and travelers are urged to avoid these areas. Since September 1996, U.S. Government personnel have been restricted from travel to Sucumbios province. Following the October 2000 kidnapping of ten foreign oil workers, including five American citizens, U.S. Government personnel have also been restricted from travel to Orellana province.*

## II.  JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, the ATCA and the TVPA, 28 U.S.C. §1350, for the alleged violations of international human rights law. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

6. This Court also has diversity jurisdiction pursuant to 28 U.S.C. 1332 (a)(2).  All Plaintiffs are citizens and domiciles of Ecuador and Defendants are all United States corporations incorporated in the United States with their principal place of business also in the United States.

Defendant DynCorp is a Deleware corporation with its principal place of business in Reston, Virginia. Defendant DynCorp AT is, on information and belief,  a Deleware corporation with its principal place of business in Fort Worth, Texas.  Defendant DynCorp TS is a Deleware corporation with its principal place of business in Fort Worth, Texas.  Defendant DynCorp Int'l is also a Deleware corporation with a principal place of business in Fort Worth, Texas. The amount in dispute between each Plaintiff and each defendant exceeds $75,000.

7. Personal jurisdiction over all the DynCorp Defendants is based on D.C. Statutes § 13-423.

8. Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c). As the factual allegations in ¶¶ 22-32 establish, Defendants are doing substantial business in the District of Columbia, and the contract with the U.S. government to conduct the spraying that resulted in Plaintiffs' injuries was negotiated and awarded in the District of Columbia.

### III.  PARTIES

#### Plaintiffs

9.  Plaintiffs Venancio Aguasanta Arias (Ecuadorian Identity Card No. 1600251084) and Rosa Tanguila Andi (Ecuadorian Identity Card No. 1500479611), are husband and wife, and reside in La Comunidad San Francisco 2, Province of Sucumbios, Ecuador. They allege on good faith information and belief, on behalf of themselves, their four minor children, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides was carried out by employees or agents of the DynCorp Defendants in Colombian territory located no more than one mile from their home in Ecuador.  The herbicides were sprayed repeatedly over the aforementioned period day after day,  with occasional rest periods of two and three days.  On the days the fumigation took place,  the spraying occurred between six in the morning and four in the afternoon.  Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiffs.

10. As a result of the heavy fumigation carried out by the DynCorp Defendants over the area, Plaintiffs Venancio Aguasanta Arias and Rosa Tanguila Andi, and their children, developed serious health problems including heavy fevers, diarrhea, and dermatological problems.  One of the Plaintiffs' children, Venancio Andres, was affected so severely by the spraying that he suffered from heavy bleeding through his intestinal system and had to be transported to the hospital at Lago Agrio,  where he was treated.  Plaintiffs and their children were in an excellent state of health prior to the fumigations by Defendants, and suffered the aforementioned medical problems for a period of weeks after the fumigations stopped.  They continue to suffer to this day from serious irritations to their eyes which they have not been able to cure.  In addition to the health problems developed as a result of the fumigations of their land, Plaintiffs suffered the losses of their coffee, yucca, plantain and rice plantations,  which is their sole source of subsistence.  The animals they own were severely affected by the fumigations, including that their chickens developed blisters in their skin and died.

11. Plaintiff Ester Inez Andi (Ecuadorian Identity Card No. 2100210455) is a single mother, twenty five years of age, and a resident of La Comunidad San Francisco 2, Province of Sucumbios, Ecuador. She alleges on good faith information and belief, on behalf of herself, her minor child, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides was carried out by employees or agents of the DynCorp Defendants in Colombian territory located no more than one mile from her home.  The herbicides were sprayed repeatedly over the aforementioned period day after day,  with occasional rest periods of two and three days.  On the days the fumigation took place,  the spraying occurred between six in the morning and four in the afternoon.  Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiff.

12. As a result of the heavy fumigation carried out by the DynCorp Defendants over the area,  Plaintiff  Ester Inez Andi developed serious health problems including serious pains all

over her body, fever, diarrhea and sores on her body.  Plaintiff's child,  who was born in March, 2001,  suffered from heavy bleeding through her intestinal system and had to transported to the Hospital in Quito, on the recommendation of the physicians of Lago Agrio, since the hospital in Lago Agrio did not have adequate facilities or knowledge to treat the child from the poisoning suffered as a result of the fumigations.  Other children in the community have suffered equally as a result of the fumigations, including at least two who died.  Deaths of infants have not occurred in this community for at least five years prior to the spraying campaign of the DynCorp Defendants.

13. Plaintiffs Santiago Domingo Tanguila Andi (Ecuadorian Identity Card No. 1500455058) and Laura Saritama, husband and wife, are of Quechua nationality, and reside in La Comunidad San Francisco 2, Province of Sucumbios, Ecuador. They allege on good faith information and belief, on behalf of themselves, their two minor children, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides was carried out by employees or agents of the DynCorp Defendants in Colombian territory located no more than one mile from their home in Ecuador.  The herbicides were sprayed repeatedly over the aforementioned period day after day,  with occasional rest periods of two and three days.  On the days the fumigation took place,  the spraying occurred between six in the morning and four in the afternoon.  Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiffs.

14. As a result of the heavy fumigation carried out by the DynCorp Defendants over the area, Plaintiffs Santiago Domingo Tanguila Andi and Laura Saritama, and their children, developed serious health problems including heavy fevers, diarrhea, and dermatological problems.  Plaintiffs treated their children at home with medicines appropriate to their culture, but upon not obtaining satisfactory results, transported the children to the Hospital at Lago

Agrio, the sub center of Health of San Francisco de Lago Agrio,  and the sub center General Farfay in Lago Agrio.  Finally, they took their children to the private clinic of Dr. Gonzabay.

15. Plaintiff Santiago Domingo Andi is a school teacher in the community's school named Escuela Pedro Francisco Tanguila, and attests herein that during the fumigation period, eighteen of the twenty one students in his class fell ill and the school had to be closed for lack of pupils.  In addition, the coffee, yucca and plantain plantations cultivated by him and his family were killed by the fumigants at a considerable financial loss to Plaintiffs.

16. Plaintiffs Vidal Camacho and Deicy Lalangui, husband and wife, and residents of La Comunidad San Francisco 2, Province of Sucumbios, Ecuador, allege on good faith information and belief, on behalf of themselves, their five minor children, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides was carried out by employees or agents of the DynCorp Defendants  in Colombian territory located no more than one mile from their home.  The herbicides were sprayed repeatedly over the aforementioned period day after day, with occasional rest periods of two and three days.  On the days the fumigation took place, the spraying occurred between six in the morning and four in the afternoon.  Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiffs.

17.  As a result of the heavy fumigation carried out by the DynCorp Defendants over the area, Plaintiffs Vidal Camacho and Deicy Lalangui, and their children, developed serious health problems including heavy fevers, diarrhea, dermatological problems, headaches and serious stomach problems including heavy vomiting.  As a result of the illnesses caused by the fumigant sprays, their children, especially their daughter Maura,  lost many days of school to the point that their school had to be closed for weeks for lack of pupils.  Plaintiffs were forced to travel to the Hospital in Lago Agrio and to the medical sub center in San Francisco.  In neither medical

facility were the physicians able to explain the symptoms suffered by the children and caused by the fumigations. Plaintiffs' son, Anderson, was hospitalized for five days. In the three years that Plaintiffs have resided in La Comunidad San Francisco 2, they had never had a medical crisis of this magnitude which affected the entire family at the same time. Plaintiffs are subsistence farmers who depend on their yearly crops of rice and pineapple. Their plantations of rice and pineapple were destroyed by the fumigants causing a severe economical crisis for the family.

18. Plaintiffs Jose Castillo (Ecuadorian Identity Card No. 1708094451) and Bethy San Martin, husband and wife, and residents of La Comunidad San Francisco 2, Province of Sucumbios, Ecuador, allege on good faith information and belief, on behalf of themselves, three minor children, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides was carried out by employees or agents of the DynCorp Defendants in Colombian territory located no more than one-half mile from their home. The herbicides were sprayed repeatedly over the aforementioned period day after day, with occasional rest periods of two and three days. On the days the fumigation took place, the spraying occurred between six in the morning and four in the afternoon. Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiffs.

19. As a result of the heavy fumigation carried out by the DynCorp Defendants over the area, Plaintiffs Jose Castillo and Bethy San Martin, and their children, developed serious health problems including vomiting and diarrhea, which were also suffered by all their neighbors following the fumigations. Plaintiff Bethy San Martin was four to five months pregnant during the spraying and she suffered serious medical problems including heavy coughing, vomiting and diarrhea. Her child was born with serious deformities, constant vomiting, fever, coughing, testicular inflammation, and eventually died on June 30, 2001. In Plaintiffs' community there was another death of a child in January, and another two deaths of children occurred after the

fumigations were completed.  Another child in their community was born after the fumigations with serious neurological problems, unable to nurse from her mother.  In the past two years, prior to the fumigations, there have been no deaths of children in Plaintiffs' community or in adjacent communities.  Plaintiffs' deceased infant was treated by the physicians of Lago Agrio,  who could not find a cure.  In addition to the death of their child and the medical problems the family has gone through as a result of the fumigations, the subsistence crops the family grows in their patch of land were destroyed by the DynCorp Defendants at a significant economic loss to the family.

20. Plaintiffs Jofre Jijon Alvarado and Enma Peña, husband and wife, and residents of La Comunidad San Francisco 1, Province of Sucumbios, Ecuador, allege on good faith information and belief, on behalf of themselves, their minor son, and all others similarly situated, that between January and February of 2001, heavy spraying of toxic herbicides carried out by employees or agents of  the DynCorp Defendants  in Colombian territory located no more than one-half mile from the home of the Plaintiffs.  Heavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the home and land of Plaintiffs.

21. As a result of the heavy fumigation carried out by the DynCorp Defendants over the area, Plaintiffs Jofre Jijon Alvarado and Enma Peña and their child developed serious health problems including fever, diarrhea, and respiratory problems, which were also suffered by all their neighbors following the fumigations.  As a result of the medical condition of their child, they were forced to take him to the hospital in Lago Agrio, where the physicians diagnosed him with pulmonary problems, and told them that he had seen in the last few days a number of similar cases, all of them of residents of the zones sprayed with the fumigants.  They also stated that they believed that all these medical conditions were the result of the fumigations.  Plaintiffs' child remained hospitalized for five days.  During that week Plaintiffs determined that the majority of the people hospitalized originated in the zone where the fumigations were taking

place.  Plaintiff Enma Peña met her immediate neighbor in the hospital whose child was also hospitalized as a result of the fumigations, and she was a witness to the death of another child who arrived at the hospital from the zone immediately adjacent to the Colombian frontier where heavy fumigations had occurred.  Plaintiffs' coffee plantation was decimated by the fumigation, causing the subsistence farming family a devastating economic blow.  In addition, all of their domesticated birds developed growths in their bodies and died immediately after the fumigations.

### The DynCorp Defendants

22. Defendant DynCorp is a Delaware corporation doing business in a number of locations in the United States. Its business consists of information technology and outsourcing professional and technical services primarily to the U.S. government, which accounts for 98% of its revenue. Through its U.S. government related contracts, DynCorp regularly conducts business within the District of Columbia. In addition,  DynCorp engages in activities to further its business within the District of Columbia including regular interactions with Members of Congress, the Executive Branch, and various agencies of the U.S. Government including the Department of State.  With more than 22,000 employees worldwide and average yearly sales over 1.8 billion, DynCorp is among the largest employee-owned technology companies in the United States.

23. Defendant DynCorp AT  is a wholly-owned subsidiary and/or unit of DynCorp operating from Fort Worth, Texas. It provides technical and outsourcing services related to aviation.  As a wholly-owned subsidiary and/or unit of DynCorp, DynCorp AT is doing business and authorized to do business in the District of Columbia, both on its own behalf and through its position as a wholly-owned subsidiary of Defendant DynCorp.

24. Defendant DynCorp TS is a Delaware corporation, and is also a wholly-owned subsidiary of DynCorp operating from Fort Worth, Texas. DynCorp TS has operations in more than 80 worldwide locations and employs over 12,900 worldwide.  Its operations include aviation services, international program management, and personal and physical security services. As a wholly-owned subsidiary, DynCorp TS is doing business and authorized to do business in the District of Columbia, both on its own behalf and through its position as a wholly-owned subsidiary of Defendant DynCorp.  Upon information and belief, in 1993 DynCorp TS acquired DynCorp AT and may now institutionally manage for the DynCorp Defendants, either partially or fully, the harmful aerial spraying operations described herein which caused injury to Plaintiffs.  Further, as an acquiring company, with full knowledge of DynCorp AT involvement in a U.S. government contract to conduct potentially harmful aerial spraying, DynCorp TS remains fully liable for its own acts and that of DynCorp AT.

25. Defendant DynCorp Int'l is a newly formed Delaware Corporation and is a subsidiary of DynCorp operating from Fort Worth, Texas.  Upon information and belief, DynCorp Int'l is wholly-owned by DynCorp and was created in January 2001 to focus on the company's extensive international business in a single unit.  As a wholly-owned subsidiary of DynCorp, DynCorp Int'l is doing business and authorized to do business in the District of Columbia, both on its own behalf and through its position as a wholly-owned subsidiary of Defendant DynCorp. Corporate reports indicate that DynCorp Int'l contracts are predominately to the U.S. Government and its agencies and that it has revenues of approximately $550 million and more than 7,500 employees worldwide. Upon information and belief,  DynCorp Int'l may now institutionally manage for the DynCorp Defendants,  either partially or fully, the harmful aerial spraying operations described herein which caused injury to Plaintiffs.

26. Plaintiffs allege on good faith, information and belief that Defendant DynCorp either itself or through its subsidiaries/units DynCorp AT, DynCorp TS, and/or DynCorp Int'l contracted, sometime in the years 1999 or 2000, with the U.S. Department of State or other U.S. agency to allegedly exterminate, by use of fumigants sprayed from airplanes,  plantations of cocaine and/or heroin poppies in large tracks of the Colombian rainforest owned by private citizens of Colombia. Upon information and belief, the solicitation for this contract by the U.S. Government, as well as the bid proposal for the contract and the award of the contract occurred in the District of Colombia.

27. Plaintiffs allege on good faith, information and belief that the monetary compensation to the DynCorp Defendants for the extermination of cocaine plants and/or  heroin poppies from the Colombian rainforest comes directly from funds approved by the United States Congress for such purposes and that the divestment of these funds is carried out under a plan made known to the public as "Plan Colombia."

28. Plaintiffs allege on good faith, information and belief that the contract entered into between  DynCorp and the U.S. State Department or other U.S. agency does not provide for the spraying of fumigants or the contamination with toxic chemicals of any part of Ecuador, especially the region where Plaintiffs reside. Rather, it would violate the terms of any contract with the U.S. government for the DynCorp Defendants to spray poisonous herbicide on the persons, land and livestock of the Plaintiffs,  and others similarly situated, who reside in Ecuador.

29.  Plaintiffs allege on good faith, information and belief that the spraying of lands in Ecuador by the DynCorp Defendants, in the same region where Texaco, Inc, while exploiting oil

reserves in the region, created one of the largest ecological disasters known to man, aids to create fear in the local population and is aimed  to prevent any disruptions to the oil ventures under way in the region. Plaintiffs further allege on good faith information and belief that the areas in Ecuador being sprayed by DynCorp in total defiance of international law are the projected source of more than two billion barrels of oil. Based on good faith, information and belief, Plaintiffs allege that the American oil industry maintains a lobbying group in Washington D.C. under the name the U.S.-Colombia Business Partnership that lobbies the Congress of the United States, and the Executive Offices and related agencies of the United States, for continuous funding and expansion of Plan Colombia.

30. Plaintiffs further allege on good faith, information and belief that contributing members to the U.S.-Colombia Business Partnership, include Texaco, Inc., Occidental Petroleum and B.P. Amoco, which have or expect to have oil interests in the region of Ecuador where Plaintiffs reside. Oil corporations such as Texaco (currently merging with Chevron Inc.) are despised by the local population in Ecuador because of the devastation they have caused to the rainforest through years of operations there. Knowing this, the U.S.-Colombia Business Partnership lobbies for military expenditures in the region in order to intimidate the local population into submission and prevent disruption to their extremely profitable oil ventures.

31. Plaintiffs allege on good faith, information and belief that it is cheaper for corporations such as Texaco to lobby for money designed to intimidate the local population rather than to take the necessary actions to repair the damage to the environment they created by their reckless practices designed only for profit, and that this lobbying is one of the causes of the creation of the fumigation program operated by the DynCorp Defendants.

32. Plaintiffs allege on good faith, information and belief that the spraying of Plaintiffs' persons, lands and livestock with toxic fumigants is nothing less than an act of mercenary war carried out surreptitiously by the DynCorp Defendants in total defiance of international law, and outside the parameters of any legal contract to implement "Plan Colombia."

33. Defendant DynCorp is fully liable for its own acts and the acts of any subsidiaries, units, divisions, or other entities directly or indirectly under its ownership and control, including DynCorp AT, DynCorp TS, and DynCorp Int'l in relation to the unlawful acts alleged herein. Further, any such subsidiaries, units, divisions, or other entities are alter egos of Defendant DynCorp, or alternatively, are in an agency relationship with it. Defendant DynCorp is also vicariously liable under the doctrine *of respondeat superior* for the acts or omissions of any subsidiaries, units, divisions, or other entities under its ownership and control, and for the acts of any employees or agents.

## IV.  **DEFENDANTS' WRONGFUL CONDUCT THAT DAMAGED PLAINTIFFS**

34. Pursuant to the contract to conduct aerial spraying over areas of Colombia alleged to be where cocaine and heroin are grown, the DynCorp Defendants utilized a fumigant that is harmful to humans, livestock, and plants other than cocaine or opium poppies. Further the DynCorp Defendants sprayed the toxic herbicide at or near the border between Colombia and Ecuador without regard to the health impact on innocent people and knowing or acting in willful disregard of the fact that winds would carry the toxic spray to areas inhabited by Plaintiffs and the members of the class.

35. Plaintiffs allege on good faith information and belief that the fumigant sprayed by the DynCorp Defendants over Plaintiffs and Plaintiffs' lands and livestock has a very high **inhalation** toxicity rating, and that the DynCorp defendants knew or should have known this, but acted to release the poison spray on areas inhabited by Plaintiffs and the members of the class.

36. The position of the United States government, as expressed by Assistant Secretary of State Rand Beers, is that the fumigant used by the DynCorp Defendants in the rainforest of the Amazon has toxicity similar to common salt. Mr. Beers's position is based on incomplete tests of **ingestion** carried out using laboratory animals with only one component of the fumigant, and not on **inhalation** toxicity tests for the entire compound that was, as described herein, sprayed on and inhaled by Plaintiffs and the class.

37. Dr. Adolfo Maldonado Campos is a medical professional of Spanish nationality, who holds a diploma in Tropical Medicine and who spent six years between 1987 and 1993 working in the region that is the subject matter of this Complaint and became completely familiar with tropical deceases prevalent in the region. From 1994 to 1998 Dr. Maldonado worked as a physician in Mexico and Guatemala dealing with health problems of subtropical regions.

38. During June of 2001, Dr. Maldonado visited the region that is the subject matter of this Complaint, along with a member of the Ecuadorian National Congress, to verify complaints from the population regarding the spraying of the region with fumigants dropped from airplanes.

39. After a comprehensive study of the health impact of fumigations in the region, Dr. Maldonado concluded:

a)      One hundred per cent of the inhabitants of the region within five kilometers of the Colombian border where fumigations occurred suffer from symptoms associated with acute intoxication from the aerial spray released upon them by the DynCorp Defendants.  The percentage of residents suffering from acute intoxication decreases to eighty nine per cent of the population within the zone located between five and ten kilometers from which the fumigations occurred.

b)      The intensity of the health impact can be measured by the average number of symptoms experienced by the local population, which he found to be between two to eighteen symptoms per person, with an average of six within the two kilometer zone from the fumigations; one to eleven symptoms with an average of four within ten kilometers from the fumigation zone.

c)      In the communities located close to the fumigations, all the schools had to be closed after the fumigations due to illnesses developed by all the children;  fifty eight schools were closed in Nuevo Mundo, twenty five were closed in San Francisco 1; and  twenty one were closed in San Francisco 2.

d)      A large sector of the impacted population required medical attention in the medical sub centers of the region.  The center at Parroquia Farfan had an increase of forty two per cent in acute respiratory illnesses, and a forty eight per cent increase in infections of the skin, both  compared to the identical time period of prior years.  The Hospital Marco Vinicio Iza reported as well a significant increase of respiratory illnesses and infections of the skin since January of 2001 when the fumigations began.

e)      The symptoms associated with exposure to the fumigants include serious irritations to the eyes, skin problems including abscesses,  acute respiratory illnesses, and digestive problems with vomiting and diarrhea.

f)      Three months after the fumigations had stopped the number of individuals with dermatological problems remained high.

g)      There were four deaths of children in January of 2001, when the fumigations began, two from the Community of Reina del Cisne, one from San Francisco2, and one from El Condor.  There had been no deaths of children in these communities in the previous two years. In addition, two children borne from mothers exposed to the fumigations, show congenital malformations.

40. Dr. Maldonado also established that the fumigations impacted severely the fauna of the area,  as well as the subsistence crops of the people in the fumigated area.  Deaths of animals including cows, pigs, horses, chickens, cats, dogs, as well as mountain animals,  were reported. Crops destroyed by the fumigations include coffee, yucca, rice, and hay.  The loss of crops and animals has forced many inhabitants of the area to abandon their homes and flee the area.  Local Indian Shamans report that they can no longer use their medicinal herbs due to the contamination of these herbs with the fumigants.

41. Prior to going forward with the plan to spray the Colombia-Ecuador border region, neither the DynCorp Defendants, nor the U.S. or Colombian governments, tested the toxic herbicide that was sprayed on Plaintiffs and the members of the class to determine its toxic effect on humans who inhale the poison.  In addition, subsequent to the spraying, neither the DynCorp Defendants, nor the U.S. or Colombian governments,  have visited the area of Ecuador where Plaintiffs and the members of the class reside to test for any health impact on the people exposed to the toxic herbicide subsequent to its being sprayed on the people by the DynCorp Defendants.

## V.  **DEFENDANTS' VIOLATIONS OF LAW**

42.  Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

         (a)        Alien Tort Claims Act, 28 U.S.C. § 1350;

         (b)        Torture Victim Protection Act, 28 U.S.C. § 1350;

    (c)        Common law of the United States of America;

(d)        United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

ᣆ

         (e)        Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N.

Doc. A/810 (1948);

         (f)        International Covenant on Civil and Political Rights, G.A. Res.

2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc.

A/6316 (1966);

         (g)        Convention Against Torture and Other Cruel, Inhuman or

                  Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N.

Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j) Violation of International Law in trespassing the frontier between Colombia and Ecuador; and

(k) Statutes and common law of the District of Columbia, including but not limited to wrongful death, assault and battery, negligence, recklessness, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## VI.  STATEMENT OF DAMAGES

43.     Plaintiffs hereby incorporate paragraphs 1 through 42 as though fully set forth

herein.

44.   As a direct and proximate result of its properties' exposure to and/or contamination

with a toxic herbicide, plaintiffs have been denied full use and enjoyment of their properties and

have incurred and will incur damages including loss of their crops, and medical expenses.

45.     As a direct and proximate result of the defendant's conduct, plaintiffs might be

forced to relocate on a permanent basis, and might be forced to expend various sums of money in

this regard.

46.     As a direct and proximate result of the contamination of their  properties with

toxic herbicides plaintiffs have sustained a serious and permanent diminution and loss in the

value of their real estate properties.

21

47.     As a direct and proximate result of the defendant's conduct, plaintiffs will be

required to carefully monitor their health for the rest of their lives due to the significant exposure

to a toxic herbicide.

48.     As a direct result of the outrageous in character, and extreme in degree conduct of

DynCorp defendants in contaminating plaintiffs' lands with a toxic herbicide and exposing

plaintiffs to a toxic herbicide and subjecting recklessly and/or intentionally plaintiffs to

contamination with a toxic herbicide, plaintiffs have suffered emotional distress and are entitled

to compensation for this emotional distress.

49.     As a direct result of the outrageous in character, and extreme in degree conduct of

DynCorp defendants in contaminating plaintiffs' lands with a toxic herbicide and exposing

plaintiffs to a toxic herbicide and subjecting recklessly and/or intentionally plaintiffs to

contamination with a toxic herbicide, some of plaintiffs have died and their next of kin are

entitled to compensation for their wrongful death.

## VII. CLASS ACTION ALLEGATIONS

50. Plaintiffs incorporate by reference paragraphs 1 through 49 of this Complaint as if set

forth herein.

51. Plaintiffs bring this action individually, and pursuant to Rule 23(a) and 23(b)(3), on

behalf of the following class:

All individuals who during the period starting on June of 2000, to the present time reside

or did reside in the region of Ecuador comprised by an area bounded on the North by the

frontier of Ecuador with Colombia, extending South ten kilometers of the aforementioned

frontier, and bounded on the West by the 77.5 degree meridian West of Greenwich

England and on the East at the point where the mutual border between Colombia and

Ecuador meet with Peruvian territory.

52. The class is so numerous that joinder of all members is impracticable.   Plaintiffs believe that there are at least ten thousand members of the class.

53. There are questions of law and fact common to the class.

54. Plaintiffs' claims are typical of the claims of the class.   Plaintiffs seek redress for the same conduct which has affected all class members and press legal claims which are the same for all class members.

55. Plaintiffs will fairly and adequately represent the class.   Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, who will vigorously prosecute this action.

56. Common questions of law predominate over individual issues.   Such common questions include but are not limited to, the following:

a)   the policies, procedures, guidelines and purported authority used by the DynCorp Defendants to spray Plaintiffs and their lands with a toxic herbicide;

b)   whether the DynCorp Defendants' spraying of plaintiffs and their lands with a toxic herbicide was negligent;

c)   whether the DynCorp Defendants' spraying of Plaintiffs and their lands with a toxic herbicide constitute intentional conduct or malfeasance;

d)   whether the DynCorp Defendants were negligent or reckless in evaluating the dangers of spraying a toxic herbicide upon people and their crops;

e)   whether the region defined in the class definition was sprayed or contaminated by the DynCorp Defendants with a toxic herbicide;

f)      whether the region defined in the class definition has been contaminated by a oxic herbicide;

g)      whether the herbicide sprayed by the DynCorp Defendants is toxic to people;

h)      whether the herbicide sprayed by the DynCorp Defendants destroys coffee, yucca, plantain and other subsistence crops of plaintiffs;

j)      whether the DynCorp Defendants' conduct constitute a nuisance;

k)      whether the class should receive medical monitoring;

l)      whether the DynCorp Defendants' conduct was wanton and outrageous;

m)      whether the DynCorp Defendants are  liable for punitive damages, and;

o)      whether the class is entitled to equitable relief.


57. A class action is the superior method for adjudication of this controversy.  In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions.  Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against a large corporation.


## VIII.  CAUSES OF ACTION


### First Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350

### For Torture, Crimes Against Humanity, and Cultural Genocide

58. Plaintiffs incorporate by reference paragraphs 1 through 57 of this Complaint as if fully set herein.

59. The DynCorp Defendants' acts and omissions of intentionally and tortuously spraying  a toxic herbicide over Plaintiffs and Plaintiff's properties; in damaging the pristine ecosystems where plaintiffs reside; in contaminating the streams, rivers, waterways and aquifers with a toxic herbicide; in violating international frontiers in an act of mercenary undeclared war; and in threatening the survival of the people of the rainforest, caused such harm and damage to Plaintiffs as to amount to Torture. The willful invasion of Plaintiffs' homes and environment by the DynCorp Defendants using a toxic agent is reminiscent of the spraying of agent orange on innocent villagers during the Viet Nam war, an act that is now regarded as barbarous under any circumstances, but certainly against a civilian population. In this case, DynCorp's spraying of a toxic agent on Plaintiffs caused them repeated and prolonged physical and mental pain and suffering that amounts to a cruel form of torture. This torture was greatly exacerbated by the fact that most of the Plaintiffs also watched their children suffer the slow torture of pain and suffering from the effects of severe poisoning.

60. The DynCorp Defendants use of the toxic herbicide on a prolonged and repeated basis to cause ongoing and severe pain and suffering to Plaintiffs also constitutes Crimes Against Humanity.  Defendants knew or should have known that spraying Plaintiffs repeatedly over a period of months would result in widespread and systematic pain and suffering of innocent, non-combatant civilians residing in Ecuador and totally removed from any war on drugs or covert war against guerillas in Colombia. Such spraying by Defendants has devastated Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.  As a result of this cruel, inhuman or degrading treatment, Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.

61. Defendants acts and omissions described herein wiped out the subsistence crops of Plaintiffs and others in the class, leaving them with no food and no source of livelihood. This

forced some of the Plaintiffs and members of the class to flee their homes and farms to seek alternative means of support and also to seek a place to live not contaminated by the toxic poison sprayed on them by Defendants. Driving Plaintiffs and the members of the class from their ethnic homelands in the rain forest by means of aerial assault by toxic spray constitutes cultural genocide

62.   These acts of Torture, Crimes Against Humanity and Cultural Genocide violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*.  To the extent that such a showing is necessary, in acting in coordination with the Government of Colombia and the United States, Defendants acted under color of law in violating each of the applicable  laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*.

63. The DynCorp Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*, has caused Plaintiffs and the class substantial damages in amounts to be ascertained at trial.

**Second Cause of Action**
**The Torture Victim Protection Act, 28 U.S.C. § 1350**
**For Torture and Extra-judicial Killing**

64.   Plaintiffs incorporate by reference paragraphs 1 through 63 of this Complaint as if set forth herein.

65.     Defendants' acts and omissions of intentionally and tortuously spraying Plaintiffs with toxic poison were inflicted intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering.  These acts amounted to Torture of all of the Plaintiffs and the members of the class, as described above in ¶ 51.

66. With respect to the claim relating to the death of the infant child of Plaintiffs Jose Castillo and Bethy San Martin, and members of the class similarly situated whose children died following exposure to the toxic poison sprayed on the area by the DynCorp Defendants, Defendants' willful attack with lethal poison as part of an undeclared war on the Ecuadorian residents near the border with Colombia constitutes extra-judicial killing or murder.  These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*.   To the extent that such a showing is necessary, in acting in coordination with the Government of Colombia and the United States Government, Defendants acted under color of law in violating each of the applicable  laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*.

67.     The DynCorp Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*, has caused Plaintiffs and the members of the class substantial damages in amounts to be ascertained at trial.

### Third Cause of Action
### Wrongful Death

68. Plaintiffs incorporate by reference paragraphs 1 through 67 of this Complaint as if set forth herein.

69. The DynCorp Defendants committed acts that constitute wrongful death under the laws of the District of Columbia, the laws of the United States and the laws of Ecuador, and that caused the death of the infant child of Plaintiffs Jose Castillo and Bethy San Martin, as well as the deaths of children of other similarly situated members of the class.  Plaintiffs Jose Castillo and Bethy San Martin have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of their deceased child.

70. The DynCorp Defendants' actions and omissions were a direct and substantial cause of the death of the child of Plaintiffs Jose Castillo and Bethy San Martin.  Defendants failed to use due care to protect the child and others similarly situated from injury and harm, thereby proximately causing their wrongful deaths.  Plaintiffs Jose Castillo and Bethy San Martin are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

## Fourth Cause of Action
### Battery

71.     Plaintiffs incorporate by reference paragraphs 1 through 70 of this Complaint as if set forth herein.

72.     By spraying the Ecuadorian border with toxic poison, Defendants committed acts which resulted in harmful or offensive contact with the bodies of the Plaintiffs, their children, and members of the class.  Plaintiffs did not consent to the contact, which caused injury, damage, loss and harm to all of them, their children, and members of the class.

73.     The acts described herein constitute battery, actionable under the laws of the District of Columbia, the laws of the United States and the laws of Ecuador. Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

**Fifth Cause of Action**
**Assault**

74. Plaintiffs incorporate by reference paragraphs 1 through 73 of this Complaint as if set forth herein.

75.  By spraying Plaintiffs with toxic poison repeatedly and across a period of indefinite time from the perspective of the Plaintiffs, Defendants committed acts which caused Plaintiffs, their children, and members of the class to be apprehensive that Defendants would subject them to imminent batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to an immediate, intentional, offensive and harmful touching.  Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs, their children and members of the class.

76.  The acts described herein constitute assault, actionable under the laws of the District of Columbia, the laws of the United States and the laws of Ecuador. Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

**Sixth Cause of Action**
**Intentional Infliction of Emotional Distress**

77.  Plaintiffs incorporate by reference paragraphs 1 through 76 of this Complaint as if set forth herein.

78.  The acts described herein constitute outrageous conduct against Plaintiffs, their children, and members of the class, and were without privilege.

79.  By conducting an aerial attack on Plaintiffs and spraying them with toxic poison, Defendants committed acts described herein which were intended to cause Plaintiffs, their

children and members of the class to suffer emotional distress.  In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiffs, their children and members of the class to suffer emotional distress, Plaintiffs were present at the time the outrageous conduct occurred, and Defendants knew that the Plaintiffs were present.

80. Plaintiffs, their children and members of the class suffered severe emotional distress accompanied by physical and the outrageous conduct of Defendants was a cause of the emotional distress suffered by them.

81. Defendants' outrageous conduct constitutes the intentional infliction of emotional distress, and is actionable under the laws of the District of Columbia and the laws of the United States. Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

**Seventh Cause of Action**
**Negligent Infliction of Emotional Distress**

82. Plaintiffs incorporate by reference paragraphs 1 through 81 of this Complaint as if set forth herein.

83.  At all relevant times, the DynCorp Defendants owed Plaintiffs, their children, and members of the class a duty to act with reasonable care, and at all relevant times, harm and/or injury to the Plaintiffs, their children, and members of the class was reasonably foreseeable if such duty of care was breached.

84. At all relevant times, the DynCorp Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

85. At all relevant times, the DynCorp Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs, their children, and members of the class.

86. Despite said knowledge, power, and duty, the DynCorp Defendants breached their duty to Plaintiffs, their children, and members of the class, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such conduct or to otherwise protect Plaintiffs, their children, and members of the class. To the extent that said negligent conduct was perpetrated by certain Defendants, and each of them, the remaining Defendants confirmed and ratified said conduct with the knowledge that Plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

87. As a direct and legal result of Defendants' wrongful acts, Plaintiffs, their children, and members of the class have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

88. Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the District of Columbia, and the laws of the United States. Plaintiffs are entitled to recover compensatory damages in amounts to be ascertained at trial.

**Eighth Cause of Action**
**Negligence Per Se**

89. Plaintiffs incorporate by reference paragraphs 1 through 88 of this Complaint as if set forth herein.

90. Defendants failed to use ordinary or reasonable care in order to avoid injury to the Plaintiffs, their children, and members of the class.  Defendants' negligence was a cause of injury, damage, loss and harm to Plaintiffs, their children, and members of the class.

91. As a result of these acts, Plaintiffs suffered harm including, but not limited to, physical harm, pain and suffering, and severe emotional distress.  Defendants' conduct constitutes negligence and is actionable under the laws of the District of Columbia, the United States, Ecuador, the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 42, *supra*. Plaintiffs are entitled to recover compensatory damages in amounts to be ascertained at trial.

## Ninth Cause of Action
### Negligent Hiring

92. Plaintiffs incorporate by reference paragraphs 1 through 91 of this Complaint as if set forth herein.

93. On information and belief, Plaintiffs allege that the DynCorp Defendants selected, hired, retained and contracted with pilots to fly the aircraft that sprayed toxic poison on the Plaintiffs, their children, and members of the class.

94.  The DynCorp Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting with the pilots who sprayed toxic poison on the Plaintiffs, their children, and members of the class. At the time that Defendants selected, hired, retained and contracted with the pilots, and at all other relevant times, Defendants knew or reasonably should have known that the pilots  would not be able to control the precise line of spraying from their

aircraft, and would therefore spray Plaintiffs, their children, and members of the class with the poison, and, as a direct and proximate result, Plaintiffs,  their children, and members of the class would suffer injuries as alleged herein. Defendants' conduct constitutes negligence per se and is actionable under the laws of the District of Columbia, and the laws of the United States.

95.  As a direct and proximate result of Defendants' negligent selection, hiring, retention and contracting with the pilots who sprayed toxic poison on Plaintiffs, their children, and members of the class, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

## Tenth Cause of Action
### Negligent Supervision

96. Plaintiffs incorporate by reference paragraphs 1 through 95 of this Complaint as if set forth herein.

97. When engaging in the wrongful conduct alleged herein, the pilots who sprayed toxic poison on Plaintiffs, their children, and members of the class, the pilots were employees or agents of the DynCorp Defendants.  Defendants exercised control over their employees or agents, and provided direction as to the flight paths, and the frequency and duration of the spraying.

98. Defendants knew or reasonably should have known that the pilots would not be able to control with precision the spraying line due to winds and movement of the aircraft, and that as a direct and proximate result, Plaintiffs would suffer injuries as alleged herein.

99. The DynCorp Defendants had the authority to supervise, prohibit, control, and/or regulate the pilots that were acting as their employees and/or agents so as to prevent the acts and omissions described herein from occurring.  Defendants also had the ability to cease operations until such time as the violations alleged herein were stopped and/or prevented.

100. The DynCorp Defendants knew or reasonably should have known unless they intervened to protect Plaintiffs and properly to supervise, prohibit, control and/or regulate the conduct described herein, Plaintiffs would suffer the injuries described herein.

101. Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate their employees and/or agents, and also failed to make appropriate investigations into the possible negative impact on the Plaintiffs, their children, and members of the class once the initial spraying was completed. Defendants' conduct constitutes negligent supervision and is actionable under the laws of the District of Columbia, and the laws of the United States. As a direct and proximate result of Defendants' negligent supervision, Plaintiffs, their children, and members of the class have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

## Eleventh Cause of Action
### Conversion

102. Plaintiffs incorporate by reference paragraphs 1 through 101 of this Complaint as if set forth herein.

103. As part of the overall objectives of the DynCorp Defendants to spray the innocent civilian residents of Ecuador, including Plaintiffs, their children, and members of the class, Defendants, acting in concert with others as previously described intended to drive Plaintiffs, their children, and members of the class from the homes and farms. The massive spraying of toxic poison on the farm land destroyed crops, livestock, and caused long-term toxic pollution, rendering much of the farm land unusable.

104. Because Plaintiffs, their children, and members of the class had no food and no means of support once their farms were destroyed, many of them were forced to leave their

homes and seek employment and residence elsewhere. This destruction of their land by Defendants thereby deprived Plaintiffs and members of the class of property by wrongful acts and disposition as alleged above.  At the time of the conversion, Plaintiffs owned and/or possessed their property.

105. The DynCorp Defendants' conduct constitutes conversion and is actionable under the laws of the District of Columbia, and the laws of the United States. As a result of Defendants' conversion of Plaintiffs' property and the property of members of the class, Plaintiffs and the class members similarly situated were damaged by the loss  and/or the loss of the use of their property in an amount to be proven at trial.

## Twelfth Cause of Action
## Trespass

106.    Plaintiffs hereby incorporate paragraphs 1 through 105 as though fully set forth

herein.

107.    DynCorp's conduct at or near the frontier between Ecuador and Colombia

including the spraying of toxic herbicides at or near plaintiffs' properties has resulted in and

continues to cause the contamination of plaintiffs' properties with a toxic herbicide.

108.    DynCorp's intentional, reckless and unprivileged actions at or near the frontier

between Ecuador and Colombia foreseeable and proximately resulted, and continues to result, in

the intrusion and contamination of plaintiffs' properties.

109.    As a direct and proximate result of DynCorp's actions and inaction,

plaintiffs have suffered damages and will continue to suffer damages as more fully set forth

herein.

**Thirteenth Cause of Action**

**Negligent Trespass**

110.    Plaintiffs hereby incorporate paragraphs 1 through 109 as though fully set forth herein.

111.    DynCorp's conduct at or near the frontier between Ecuador and Colombia including he spraying

of toxic herbicides, has resulted, and continues to result, in the contamination of plaintiffs' properties with a toxic

herbicide.

112.    DynCorp's negligent, unprivileged actions foreseeable and proximately resulted in the intrusion

and contamination of plaintiffs' properties with a toxic herbicide.

113.    As a direct and proximate result of DynCorp's actions and inaction, plaintiffs

have suffered damages and will continue to suffer damages as more fully set forth herein.

**Fourteenth Cause of Action**

**Nuisance**

114.    Plaintiffs hereby incorporate paragraphs 1 through 113 as though fully set forth

herein.

115.    DynCorp at all times relevant herein, was the owner and/or operator of the planes

that sprayed toxic herbicides on plaintiffs lands.

116.    DynCorp created, and permitted, a condition or activity at or near the frontier

between Ecuador and Colombia which caused contamination of plaintiffs' lands with a toxic

herbicide.

117.    DynCorp's activities at or near the frontier between Ecuador and Colombia

caused and continues to cause, substantial and unreasonable interference with plaintiffs' use and

enjoyment of their properties.

118.    DynCorp's improper discharge, release, and spraying of a toxic herbicide

constitutes a public and private nuisance or a substantial unreasonable interference with

plaintiffs' use and enjoyment of their properties and the environment.

119.    As a direct and proximate result of DynCorp's action, plaintiffs have suffered

damages and will continue to suffer damages as more fully set forth herein.

## Fifteenth Count

## Nuisance Per Se

120.    Plaintiffs hereby incorporate paragraphs 1 through 119 as though fully set forth

herein.

121.    DynCorp's violation of the standards of care set forth in various laws of the

United States, Ecuador and International Laws constitutes a nuisance per se.

122.    As a direct and proximate result of the nuisance per se, plaintiffs have suffered

damages and will continue to suffer damages as more fully set forth herein.

## Sixteenth Count

## Strict Liability

123.    Plaintiffs hereby incorporate paragraphs 1 through 122 as though fully set forth

herein.

124.    The handling, use, storage, disposal and/or spraying  of a toxic herbicide

constitutes an ultrahazardous and/or abnormally dangerous activity.

125.     A toxic herbicide has been released by DynCorp and has contaminated the air,

land, water, subsurface water, ground water, drinking water, and soil of plaintiffs' properties all

of which render the same hazardous.

126.    As a direct and proximate result of such activity and such contamination, the

plaintiffs have suffered damages and will continue to suffer damages as more fully set forth

herein, and the defendant is strictly liable for these damages under common law.


**Seventeenth Cause of Action**

**Negligence in the Conduct of Ultrahazardous Activity**

127.    Plaintiffs incorporate  paragraphs 1 through 126 as though fully set forth herein.


128.    DynCorp's duty of care in light of the ultrahazardous nature of DynCorp's

activities in the vicinity of the frontier between Ecuador and Colombia is heightened

commensurate with the risk imposed by the spraying of a toxic herbicide.


129.    DynCorp breached said heightened duties of care.

130.    As a direct and proximate result of such conduct, plaintiffs have  suffered

damages as more fully described herein.

**Eighteenth Cause of Action**

**Medical Monitoring**

131.      Plaintiffs incorporate by reference paragraphs 1 through 130 of this Complaint

        as

filly as if set forth herein.

132.    As a result of defendant's negligent and reckless conduct, plaintiffs and the class

have been significantly exposed to known hazardous substances.

133.    As a result of such exposure, plaintiffs and the class are at an increase risk of

contracting latent diseases, including cancers.

134.    Early detection and treatment of these diseases is medically necessary and

advisable.

135.    Plaintiffs and the class are entitled to recover the costs of a medical monitoring

program, and to recover punitive damages in amounts to be ascertained at trial.

## IX.  **DEMAND FOR JURY TRIAL**

136.  Plaintiffs demand a trial by jury on all issues so triable.

## X.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)      determine that this case may be maintained as a class action pursuant to Fed. R. Civ. P. 23;

(b)      enter judgment in favor of Plaintiffs and the class on all counts of the Complaint;

(c)      declare that Defendants have violated Plaintiffs and the class' human rights and the laws of the

State of District of Columbia and the United States, as set forth herein;

(d)      award Plaintiffs and the class compensatory and punitive damages;

(e)      grant Plaintiffs and the class equitable relief, permanently enjoining Defendants from further

engaging in human rights abuses and violations of law as described herein against Plaintiffs and

the class members;

(f)      award Plaintiffs and the class the costs of suit including reasonable attorneys' fees, and

(g)     award Plaintiffs and the class such other and further relief as the Court deems just under the

circumstances.

Respectfully submitted this _____ day of September, 2001,

_____
Terry Collingsworth (DC Bar No. 471830)
Natacha Thys  (DC Bar No. 458143)
INTERNATIONAL LABOR
RIGHTS FUND
733 15 Street, N.W., Suite 920
Washington, DC 20005
Tel: (202) 347-4100 / Fax: (202)347-4885

_____
Cristóbal Bonifaz (MA BBO 548-405)
John C. Bonifaz (MA BBO 562-478
LAW OFFICES OF
CRISTOBAL BONIFAZ
48 North Pleasant Street
P.O. Box 2488
Amherst, MA 01004
Tel: (413) 253-5626  / Fax: (413) 253-7475

ATTORNEYS FOR PLAINTIFFS AND THE CLASS