UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
VENANCIO AGUASANTA ARIAS,     )
et al.,                       )
                              )
        Plaintiffs,           )
                              )
    v.                        )    Civil Action No. 01-1908 (RWR)
                              )
DYNCORP, et al.,              )
                              )
        Defendants.           )
_____)
```

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, citizens and domiciliaries of Ecuador, brought an action under the Alien Torts Claims Act ("ATCA"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, the common law of the United States, statutes and common law of the District of Columbia, and various international agreements and conventions, alleging physical harm and property damage stemming from defendants' contract with the U.S. government to spray pesticides in order to eradicate cocaine and heroine farms in Colombia. Defendants have moved to dismiss the action, or in the alternative, for summary judgment. Defendants have also moved to stay discovery pending the resolution of their motion to dismiss. Plaintiffs have moved to compel production of documents and answers to interrogatories. Because plaintiffs have presented a justiciable question of law under the ATCA, but have not stated a claim for violation of the TVPA, the defendants' motion to dismiss will be denied in part and granted

-2-

in part and their motion to stay discovery will be denied as
moot.  Because the parties have yet to confer as required by
Federal Rule of Civil Procedure 26, plaintiffs' motion to compel
will be denied as premature.

<u>BACKGROUND</u>

Plaintiffs make the following factual claims.  Defendants'
business "consists of information technology and outsourcing
professional and technical services primarily to the U.S.
government."  (Compl. ¶ 22; Pls.' Mem. in Opp'n to Mot. to
Dismiss at 29.)  Under a contract awarded on January 30, 1998,
defendants provide support to the U.S. State Department's
counternarcotics activities in Colombia.  This contract was
authorized and funded as part of "Plan Colombia," an initiative
designed to interrupt the flow of illegal narcotics out of the
country.  Defendants' obligations include assisting in illicit
drug crop eradication by spraying fumigants from airplanes onto
cocaine and heroin poppy plantations in Colombia.  Plaintiffs are
citizens and domiciliaries of Ecuador who have no connection to
the production of illegal drugs in Colombia.

In the course of defendants' fumigations, "heavy clouds of
liquid spray dropped from the planes, shifted with the wind, and
repeatedly fell on the home[s] and land of [p]laintiffs."
(Compl. at 6.)  Defendants used a fumigant that is harmful to
humans, animals, and plants other than cocaine and opium poppies.
While defendants claim that the U.S. government has declared that

-3-

the fumigant used by defendants has a toxicity similar to that of

common salt, this conclusion is based on incomplete ingestion

tests carried out on laboratory animals using only one component

of the fumigant, and not on inhalation toxicity tests for the

entire compound that was used.

In June 2001, Dr. Adolfo Maldonado Campos conducted a

comprehensive study of the health impact of the fumigants used in

the region and found the fumigants to be extremely harmful to

inhabitants living nearby.[1]  The fumigations severely damaged the

---

[1]   Based on this study, Dr. Maldonado made the following
findings:

(a) One hundred percent of the inhabitants of the region
within five kilometers of the Colombian border suffered from
symptoms associated with acute intoxication from the
fumigant used by defendant, while eighty-nine percent of the
population within the zone located between five and ten
kilometers from the Colombian border [also] suffered from
symptoms;

(b) the local population residing within a two kilometer
zone from the fumigations suffered from between two to
eighteen symptoms, with an average of six; while those
residing within ten kilometers from the fumigation zone
suffered from one to eleven symptoms, with an average of
four;

(c) in communities close to the fumigations, all the schools
had to be closed after the fumigations due to illnesses
developed by the children;

(d) a large sector of the impacted population required
medical attention in the medical subcenters of the region,
with centers reporting significant increases in respiratory
illnesses and infections of the skin;

(e) symptoms associated with exposure to the fumigants
included serious irritations to the eyes, skin problems
including abscesses, acute respiratory illnesses, and

-4-

fauna and subsistence crops of the people in the fumigated area, and caused the deaths of numerous animals.  The loss of crops and animals has forced local inhabitants to abandon their homes and flee the area.

Plaintiffs brought this action on behalf of themselves and all others similarly situated alleging that defendants sprayed the toxic herbicide at or near the border of Colombia and Ecuador without regard to the health impact on Ecuador's inhabitants. Plaintiffs further allege that defendants knew or acted in willful disregard of the fact that winds would carry the toxic spray to areas inhabited by plaintiffs and other members of the class.  They assert claims based on violations of the ATCA, the TVPA, the common law of the United States, statutes and common law of the District of Columbia, and various international agreements and conventions.[2]

_____

digestive problems with vomiting and diarrhea;

(f) three months after the fumigations had stopped the number of individuals with dermatological problems remained high; and

(g) there were four deaths of children in January 2001, when the fumigations began, while there had been no deaths of children in these communities in the previous two years, and two children born from mothers exposed to the fumigations show congenital malformations.

(Compl. at 17-18.)

[2]     These agreements include the United Nations Charter, 59 Stat. 1031 (1945); the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 (Dec. 10, 1948); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

-5-

DISCUSSION

Defendants move to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b), or in the alternative, for summary judgment pursuant to Rule 56.  They allege that plaintiffs' claims would entangle the court in nonjusticiable issues regarding U.S. foreign and national security policy; plaintiffs' federal law claims that are based on alleged violations of international law fail because plaintiffs do not identify any actions that would violate international law; and plaintiffs' state common law claims are preempted by the federal government's exclusive authority over foreign policy and national security.

I.   DISMISSAL

A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 55 n.6 (1976).  "To that end, the complaint is construed liberally in the plaintiffs' favor, and . . . the plaintiffs [are granted] the benefit of all

---

or Punishment, G.A. res. 39/46, 39 U.N. Doc. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (Dec. 10, 1984)(ratified 10/28/98); Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (Dec. 13, 1976); and the Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993).

-6-

inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

A.   National security

Defendants assert that plaintiffs' claims are nonjusticiable because they are "[m]atters intimately related to foreign policy and national security [which] are rarely proper subjects for judicial intervention." Haig v. Agee, 453 U.S. 280, 292 (1981). Defendants allege that plaintiffs' claims implicate foreign policy and national security because they would undermine U.S. national security by interfering with U.S. policies to stem the flow of illegal narcotics trafficking and to combat international terrorism, and they intrude upon U.S. foreign policy and diplomatic relations in the Andean region.  (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mot. to Dismiss") at 16.)  Plaintiffs claim that they are not challenging the Plan Colombia program, but simply seek to hold defendants to the terms of Plan Colombia and the agreement with the U.S. State Department, both of which prohibit fumigation in Ecuador.

The Supreme Court has recognized "'the generally accepted view that foreign policy was the province and responsibility of the Executive.'" Dep't of the Navy v. Egan, 484 U.S. 518, 529 (1988) (quoting Haig, 453 U.S. at 293-94).  "Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Id.

-7-

at 530.  However, a claim may be justiciable if it does "'not seek to litigate the political and social wisdom'" of the foreign policy decision.  Bancoult v. McNamara, 445 F.3d 427, 435 (D.C. Cir. 2006) (quoting DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev., 810 F.2d 1236, 1238 (D.C. Cir. 1987) (finding implementation of an executive policy statement justiciable)).

Here, plaintiffs do not seek review of the foreign policy decisions of the executive branch because the legality of Plan Colombia is not in dispute.  Further, the State Department's decisions regarding how Plan Colombia should have been implemented are not in question.  Cf. Bancoult, 445 F.3d at 436-37 (refusing to review implementation of policy because it was "inextricably intertwined with the underlying strategy" of the political decision); Schneider v. Kissinger, 412 F.3d 190, 198 (D.C. Cir. 2005) (refusing to review "executive's making of a policy decision and implementing that decision").  Plaintiffs' claims do not require that the court "second-guess," see Bancoult, 445 F.3d at 437, or "pass judgment" on the executive's strategic choices relating to how Plan Colombia was implemented, see Schneider, 412 F.3d at 197, because plaintiffs allege that aerial spraying into Ecuador was not an "action[] taken in furtherance of" a foreign policy objective.  Gonzalez-Vera v. Kissinger, 449 F.3d 1260, 1264 (D.C. Cir. 2006) (refusing to review "actions taken in furtherance of foreign relations themselves").  Unlike in Gonzalez-Vera, Bancoult, and Schneider,

-8-

the intended means of executing the policy in this case did not
include the acts challenged here, which plaintiffs allege were
specifically prohibited by the plan.  Thus, adjudicating
plaintiffs' claims will not "bind the executive's hands" either
"directly -- by restricting what may be done -- or indirectly --
by restricting how the executive may do it."  Bancoult, 445 F.3d
at 437.

B.   TPVA claim

Defendants argue that plaintiffs' claims under the TVPA must
be dismissed because plaintiffs fail to allege sufficient facts
to support a finding of torture.  The TVPA provides an explicit
cause of action for U.S. citizens, as well as aliens, against
"[a]n individual who, under actual or apparent authority, or
color of law, of any foreign nation," subjects an individual to
torture or extrajudicial killing.  28 U.S.C. § 1350, note, § 2;
see also Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 168-69
(5th Cir. 1999).  An extrajudicial killing is "a deliberated
killing not authorized by a previous judgment pronounced by a
regularly constituted court . . . ."  28 U.S.C. § 1350, note,
§ 3(a).  The TVPA defines torture as:

> any act, directed against an individual in the
> offender's custody or physical control, by which severe
> pain or suffering . . . whether physical or mental, is
> intentionally inflicted on that individual for such
> purposes as obtaining from that individual or a third
> person information or a confession, punishing that
> individual for an act that individual or a third person
> has committed or is suspected of having committed,
> intimidating or coercing that individual or a third

-9-

        person, or for any reason based on discrimination of
        any kind . . . .

Id. at note, § 3(b).  An act of torture would not include "the

unforeseen or unavoidable incident of some legitimate end."

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82,

93 (D.C. Cir. 2002) (interpreting the Foreign Sovereign

Immunities Act's (FSIA) definition of torture, as derived from

the TVPA and finding that "torture can occur under the FSIA only

when the production of pain is purposive, and not merely

haphazard").  "[O]nly acts of a certain gravity shall be

considered to constitute torture."  Id. at 92.  The TVPA's

"definition of torture includes a 'severity requirement' . . . .

[T]orture is a label that is 'usually reserved for extreme,

deliberate and unusually cruel practices, for example, sustained

systematic beating, application of electric currents to sensitive

parts of the body, and tying up or hanging in positions that

cause extreme pain.'"  Simpson v. Socialist People's Libyan Arab

Jamahiriya, 326 F.3d 230, 234 (D.C. Cir. 2003) (quoting Price,

294 F.3d at 92-93).  While this list is not exhaustive, "any

non-enumerated purpose would have to be similar in nature to

those mentioned in order to elevate an act . . . into an act of

torture."  Price, 294 F.3d at 93.

        Here, plaintiffs have not established that the injured

individuals were in defendants' custody or physical control, see

In re Agent Orange Prod. Liab. Litig., 373 F. Supp. 2d 7, 112

-10-

(E.D.N.Y. 2005) (finding that under the TVPA, Vietnamese nationals "were not within the defendants' custody or physical control, nor that of the United States," when harmful herbicides manufactured by defendants were used by the United States military on plaintiffs' land during the Vietnam War), nor was there any allegation that pain was inflicted for purposes of obtaining information or confessions, or punishing or intimidating anyone, or for any reason based on discrimination. In addition, plaintiffs claim the fumigants "shifted in the wind" and drifted into Ecuador.  (Compl. ¶ 9.)  This in no way implies that defendants committed a deliberated killing.  See In re Agent Orange, 373 F. Supp. 2d at 112 (finding that the "use of herbicides" did not "fit within the definition of either torture or extrajudicial killing" under the TVPA where the herbicides were not "used to intentionally inflict pain and suffering" but "were used to kill or harm plants"). Thus, plaintiffs state no claims under the TVPA and defendants' motion to dismiss the TVPA claims will be granted.

    C.   ATCA claim

    The ATCA confers upon the district court subject matter jurisdiction when an alien sues for a tort committed in violation of the law of nations or treaty of the United States.  28 U.S.C. § 1350.  "'[E]volving standards of international law govern who is within the [ATCA's] jurisdictional grant.'"  Kadic v. Karadzic, 70 F.3d 232, 241 (2d Cir. 1995) (quoting Amerada Hess

-11-

Shipping Corp. v. Argentine Republic, 830 F.2d 421, 425 (2d Cir. 1987)).  It is clear that the ATCA may be used against corporations acting under "color of [state] law," or for a handful of private acts, such as piracy and slave trading. Aldana v. Fresh Del Monte Produce, Inc., 305 F. Supp. 2d 1285, 1301 (S.D. Fla. 2003); Nat'l Coal. Gov't of the Union of Burma v. Unocal, Inc., 176 F.R.D. 329, 348 (C.D. Cal. 1997) (citing Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 794 (D.C. Cir. 1984) (Edwards, J., concurring)); see generally Wiwa v. Royal Dutch Petroleum Co., No. 96CIV8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002).

    1.   Customary international law

    Defendants first claim that plaintiffs' ATCA claim must be dismissed because defendants' actions do not violate customary international law since Congress authorized the aerial fumigations.  Relying on the D.C. Circuit holding in Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929 (D.C. Cir. 1988), defendants argue that because Plan Colombia was approved by Congress and "no enactment of Congress can be challenged on the ground that it violates customary international law," id. at 939, the plaintiffs' ATCA claims must fail.  While Congress endorsed aerial spraying in Colombia in adopting Plan Colombia, there is no evidence of Congressional authorization of using spray in Colombia that would drift into Ecuador.

-12-

In any event, plaintiffs claim that the harmful effects caused by the spraying violate numerous treaties and international agreements.  Even if defendants' actions were found to be congressionally authorized, plaintiffs have alleged a conflict between any such congressional authorization and international law.  Where there is a conflict between acts of Congress and treaties or international agreements, "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."  Cook v. United States, 288 U.S. 102, 120 (1933); accord Roeder v. Islamic Republic of Iran, 195 F. Supp. 2d 140, 169 (D.D.C. 2002) ("Without a clear expression of Congressional intent to abrogate an agreement, a court must not read an ambiguous statute to so abrogate, and must interpret the statute so as to avoid the conflict.") (citing Trans World Airlines v. Franklin Mint Corp., 466 U.S. 243, 252 (1984))); see also Weinberger v. Rossi, 456 U.S. 25, 32 (1982).  Defendants have not attempted to establish that, in approving Plan Colombia, Congress specifically intended to override the international agreements cited by plaintiffs.

   2.   State action

Defendants also claim that their aerial fumigations fail to qualify as "state action" for purposes of the ATCA.  Cases determining when private behavior constitutes state action "have not been a model of consistency."  Lebron v. Nat'l R.R. Passenger

Corp., 513 U.S. 374, 378 (1995).  Nonetheless, "[t]he 'color of
law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to
whether a defendant has engaged in official action for purposes
of jurisdiction under the Alien Tort Act."  Kadic, 70 F.3d at
245.  "A private individual acts under color of law within the
meaning of section 1983 when he acts together with state
officials or with significant state aid."  Id.  A challenged
activity may be state action under 42 U.S.C. § 1983 "when [the
activity] results from the State's exercise of 'coercive power,'
when the State provides 'significant encouragement, either overt
or covert,' or when a private actor operates as a 'willful
participant in joint activity with the State or its agents.'"
Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S.
288, 296 (2001) (citations omitted).  Further, "a nominally
private entity [is treated] as a state actor when it is
controlled by an 'agency of the State,' when it has been
delegated a public function by the State, when it is 'entwined
with governmental policies,' or when government is 'entwined in
[its] management or control.'"  Id. (citations omitted).

Plaintiffs allege that defendants contracted with the U.S.
State Department to engage in aerial spraying of cocaine and
heroin fields in Colombia (Compl. at ¶ 26), that compensation for
this task was to come from funds approved by Congress under Plan
Colombia (id. at ¶ 27), and that defendant acted in coordination
with the Colombian and U.S. governments.  (Id. at ¶¶ 66, 67.)

-14-

Plaintiffs have alleged sufficient facts to state a claim that defendants are operating as a "willful participant in joint activity with the State or its agents," are "controlled by an agency of the state," or are "entwined with governmental policies." Brentwood Acad., 531 U.S. at 296 (2001).  Defendants' activity which allegedly caused plaintiffs' harm was cloaked in the authority of the U.S. State Department and the Colombian government.  See Monroe v. Pape, 365 U.S. 167, 184 (1961) ("'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law [within the meaning of § 1983].'").  Thus, defendants' motion to dismiss the ATCA claims will be denied.

    D.   Preemption of state common law claims

    Defendants claim that plaintiffs' state tort claims are preempted by federal law because state regulation of national security concerns runs afoul of the Supremacy Clause.  Defendants also argue that a federal government determination that the herbicide used in the eradication efforts is safe preempts the state tort claims that rely on allegations that the herbicide is harmful to human health and the environment.

    "[S]tate law is pre-empted under the Supremacy Clause . . . in three circumstances.  First, Congress can define explicitly the extent to which its enactments pre-empt state law. . . . Second, in the absence of explicit statutory language, state law

is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. . . . Finally, state law is pre-empted to the extent that it actually conflicts with federal law." English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990).  "'Where . . . the field which Congress is said to have pre-empted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be 'clear and manifest.'" Id. at 79 (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977)).  "If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984) (citation omitted) (citing Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n, 461 U.S. 190, 204 (1983); Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963); Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

As is discussed above, plaintiffs' claims do not challenge the congressional policy decision to execute Plan Colombia. Contrary to defendants' allegation that "[t]hrough their state common law tort claims, plaintiffs seek to block further aerial illicit crop eradication operations in Southern Colombia that the federal government has determined are essential to U.S. foreign

-16-

relations with the Andean nations" (Defs.' Mot. to Dismiss at
33), plaintiffs do not question the legality of Plan Colombia,
nor do they seek to have the program discontinued.  Defendants
have not shown a clear and manifest statement by Congress that in
adopting Plan Colombia, it intended to supersede state tort
claims arising out of any improper implementation of that plan,
such as spraying harmful fumigants so that they drift into
Ecuador.  Thus, the state tort claims are not trumped by federal
law.

Nor are the plaintiffs' state tort claims preempted by any
federal government conclusion that the herbicide is safe to
humans, animals, and the environment.  Defendants' argument
relies on a declaration by Rand Beers, Assistant Secretary of
State for the Bureau of International Narcotics and Law
Enforcement Affairs, and a 2001 State Department Report.  Beers
states that "all drug spraying operations conducted in the Andean
region by Dyncorp International or with Dyncorp International's
support . . . use a herbicide selected, approved, and supplied to
Dyncorp International by the Bureau."  (Defs.' Mot. to Dismiss,
Ex. B ¶ 26.)  The Report summary explains that based upon
research conducted, there were "no grounds to suggest concern for
human health."  (Defs.' Mot. to Dismiss, Ex. C at 3.)  The State
Department's belief does not establish a clear and manifest
statement by Congress that the fumigant may not be challenged as
unsafe under state tort law.  See Ferebee v. Chevron Chem. Co.,

736 F.2d 1529, 1539-40 (D.C. Cir. 1984) (finding that a federal agency's determination that a product was safe for distribution under federal law and did not "pose an unreasonable risk to the normal user," did not preempt state tort claims brought challenging the product's labeling).

## II. SUMMARY JUDGMENT

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A dispute about a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Facts in dispute are material if they are capable of affecting the outcome of the suit under governing law. Id. In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiffs allege that defendants sprayed a fumigant that landed on plaintiffs' homes and land that was harmful to humans and the environment. Defendants dispute that claim, asserting that the fumigant used in the aerial eradications was found by the U.S. State Department to "not pose unreasonable risks or adverse effects to humans and the environment." (Defs.' Mot. to Dismiss at 16.) Further, plaintiffs allege that spraying fumigants in Colombia that would drift into Ecuador was not authorized by Plan Colombia. However, defendants counter that any aerial spraying done as part of Plan Colombia was authorized by its contract with the U.S. State Department. Resolution of these genuine factual disputes could certainly affect the outcome of plaintiffs' remaining ATCA, statutory, common law, and international law claims. Without the benefit of discovery to resolve these factual disputes, summary judgment would be premature. See Liberty Lobby, 477 U.S. at 257 (explaining that plaintiffs are entitled to "a full opportunity to conduct discovery"); City of Rome v. United States, 450 F. Supp. 378, 384 (D.D.C. 1978) (finding "summary judgment motions . . . premature until all discovery has been completed").

-19-

III. MOTION TO COMPEL

     The plaintiffs have moved to compel responses to discovery
requests.  Under Federal Rule of Civil Procedure 26(d), a party
is generally prohibited from seeking discovery "before the
parties have conferred as required by Rule 26(f)" unless the
court orders discovery or the parties agree to it.  See Fed. R.
Civ. P. 26(d); LCvR 26.2(a); Al Odah v. United States, 329 F.
Supp. 2d 106, 108-09 (D.D.C. 2004) (finding plaintiffs' discovery
requests premature because the parties had not yet held a Rule
26(f) discovery conference).  Because discovery may not be
demanded before the Rule 26(f) conference, a motion to compel
filed before that conference is premature, see Witham v.
Christian County Sheriffs Dep't, No. 04-3401-CV-S-FJG, 2006 WL
522438, at *1 (W.D. Mo. Mar. 3, 2006); Fox v. Poole, No. 06CV148,
2006 WL 2528535, at *2 (W.D.N.Y. Aug. 31, 2006), and violates
Rule 26(d).  See Amerisourcebergen Drug Corp. v. Burks, No.
2:04CV58, 2006 WL 2690989, at *2 (N.D. W. Va. Sept. 18, 2006).

     No written report of a discovery conference has been filed
under LCvR 16.3 and there is no other indication that a Rule
26(f) conference has occurred.  Further, there has been no order
directing the parties to engage in discovery and the parties do
not appear to have agreed to do so.  Therefore, plaintiffs'
motion to compel discovery will be denied without prejudice as
premature.

-20-

CONCLUSION AND ORDER

Plaintiffs have failed properly to allege a violation of the TVPA.  However, plaintiffs' remaining claims do not challenge Congress's decision to implement Plan Colombia or impinge upon defendants' authority to act in furtherance of national security. Additionally, plaintiffs have sufficiently alleged state action by the defendants and violations of the ATCA.  Defendants have not shown how Congress, in adopting Plan Colombia, intended to endorse aerial spraying that would effect neighboring Ecuador, or to abrogate any U.S. obligations under the various international agreements and conventions that plaintiffs claim have been violated.  Plaintiffs' state common law claims are not preempted by federal law, and genuine issues of material fact preclude summary judgment.  Lastly, plaintiffs' motion to compel is premature.  Accordingly, it is hereby

ORDERED that defendants' motion [7] to dismiss or for summary judgment be, and hereby is, GRANTED in part and DENIED in part.  Plaintiffs' claims under the TVPA are DISMISSED.  Their remaining claims survive, and summary judgment is DENIED.  It is further

ORDERED that defendants' motion [20] to stay discovery pending resolution of the motion to dismiss be, and hereby is, DENIED as moot.  It is further

ORDERED that plaintiffs' motion [37] to compel be, and hereby is, DENIED without prejudice.

-21-

SIGNED this 21st day of May, 2007.

_____
RICHARD W. ROBERTS
United States District Judge