UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                )
VENANCIO AGUASANTA ARIAS,       )
et al.,                         )
                                )
        Plaintiffs,             )
                                )    Civil Action No. 01-1908 (RWR)
    v.                          )
                                )    Consolidated with Civil Action
DYNCORP, et al.,                )    No. 07-1042 (RWR) for case
                                )    management and discovery
        Defendants.             )    purposes
                                )
                                )    UNDER SEAL
                                )
```

## MEMORANDUM OPINION

Plaintiffs, approximately 2,000 Ecuadorian citizens and domiciliaries, bring common law negligence and other tort claims against the DynCorp defendants, alleging acute and chronic personal injuries caused by the defendants spraying herbicides over the plaintiffs' lands in Ecuador.[1]  The defendants have filed a motion under Federal Rule of Evidence 702 to exclude the testimony of the plaintiffs' proffered expert witness, Dr. Michael A. Wolfson.  Because the plaintiffs failed to establish the reliability of Dr. Wolfson's expert opinions regarding the proper mixture and application rate of the Plan Colombia herbicide and plaintiffs' future need for medical monitoring, or his qualifications to render those opinions, or

---

[1] The plaintiffs also claim that the fumigant caused property damage, but the plaintiffs' claims regarding injury to their farms, livestock, and fish were dismissed in an earlier order. See Mem. Op. entered Feb. 7, 2013 at 11.

the reliability of his opinions regarding general causation of
the plaintiffs' acute and chronic injuries and specific causation
of the plaintiffs' chronic injuries, but the plaintiffs met their
burden regarding Dr. Wolfson's opinion of the specific causation
of the plaintiffs' acute injuries, the defendants' motion to
exclude Dr. Wolfson's testimony will be granted in part and
denied in part.  The defendants also move for summary judgment
arguing that without Dr. Wolfson's expert testimony, the
plaintiffs cannot show that exposure to the Plan Colombia
herbicide caused their injuries.  Because Dr. Wolfson's general
causation opinion regarding the plaintiffs' acute injuries and
his general and specific causation opinions regarding the
plaintiffs' chronic injuries are inadmissible, the defendants are
entitled to judgment as a matter of law.

## BACKGROUND

The Department of State ("DOS") hired the defendants to help
eradicate Colombian cocaine and heroin poppy plantations.  Arias
v. DynCorp, 856 F. Supp. 2d 46, 49 (D.D.C. 2012).  To carry out
the mission, which was known as "Plan Colombia," the defendants'
planes sprayed aerial fumigants over Colombian drug farms.  The
fumigant was a glyphosate-based herbicide.  Am. Compl. ¶ 35.
"Commercial versions of the herbicide have been sold under the
trade name Roundup®."  Id.  However, the planes' fumigants
allegedly also drifted onto the plaintiffs' lands in Ecuador,

harming "humans, animals, and plants other than cocaine and opium poppies[.]"  Arias, 856 F. Supp. 2d at 49 (internal citation and quotation marks omitted).  These fumigations are alleged to have severely damaged the plaintiffs and their property and, as a result, forced those residing in the affected areas to flee.  Id. The test plaintiffs reported several acute injuries including "itchiness to the skin, nose, and eyes; skin irritation; burning sensation to the skin and eyes; rash; vomiting; respiratory problems; headaches; dizziness; stomach aches; diarrhea; and burning throat."  Pls.' Opp'n to DynCorp's Mot. to Exclude the Opinions of Pls.' Expert Dr. Michael Wolfson & Associated Mot. for Summ. J. ("Pls.' Opp'n"), Ex. 1 (Michael A. Wolfson Expert Rpt. ("Wolfson Rpt.") at 3).  The plaintiffs now bring common law tort claims and claims under the Alien Tort Claims Act against the defendants, all arising from injuries the fumigants allegedly caused.

The plaintiffs proffer as an expert Dr. Michael A. Wolfson to offer opinion testimony in several areas.  First, he would state that the DynCorp defendants applied the Plan Colombia herbicide in a manner contrary to the directions on the Roundup label.  Second, Dr. Wolfson would offer testimony linking general and specific causation of the plaintiffs' acute personal injuries to their alleged exposure to the Plan Colombia herbicide.  See Pls.' Opp'n at 2.  Third, Dr. Wolfson would opine that as a

-4-

result of the plaintiffs' exposure to the Plan Colombia
herbicide, the plaintiffs have an increased risk of developing
several cancers, including non-Hodgkin's lymphoma, hairy cell
leukemia, and multiple myeloma.  Wolfson Rpt. at 3.  Given the
plaintiffs' risk of future adverse health effects, Dr. Wolfson
would also testify that the plaintiffs should be provided with
medical monitoring for early detection of cancer.  Id. at 4.

Dr. Wolfson received his Masters of Science in Pharmacology
from Northeastern University and holds a medical degree from
State University of New York Upstate Medical Center and a Masters
of Public Health from Harvard School of Public Health.  Wolfson
Rpt., Ex. A. at 1.  Dr. Wolfson is "Fellowship-trained and Board
Certified in Occupational Medicine (1995) with clinical training
in occupational and environmental medicine," and has "engaged in
the practice of Occupational and Environmental Medicine for over
twenty-two years[.]"  Wolfson Rpt. at 1.  His clinical practice
has included "environmental and occupational risk assessment and
toxic exposure evaluations, diagnoses, treatment, and referrals."
Id. at 2.  Currently, Dr. Wolfson is the Medical Director of
Syracuse Occupational and Environmental Medicine Consultants.
Id.  Although not a toxicologist or epidemiologist, DynCorp
Defs.' Mot. to Exclude the Test. of Pls.' Sole Expert Witness,
Dr. Michael Wolfson & Associated Mot. for Summ. J. ("Defs.'
Mot."), Defs.' App. ("Defs.' App.") (Michael A. Wolfson Dep.

("Wolfson Dep.") at 9:5-6, 9:15-16), Dr. Wolfson has "rendered thousands of diagnoses and opinions on the causation of disease involving complex issues of toxic exposures[,]" Wolfson Rpt. at 2.

The DynCorp defendants move to exclude Dr. Wolfson's expert testimony.   The defendants argue that Dr. Wolfson is not qualified to offer his three opinions and that his opinions are unreliable.   Defs.' Mot. at 1-3.   The defendants further move for summary judgment arguing that in a toxic tort case, expert testimony is necessary to prove causation.   They argue that if Dr. Wolfson's testimony is excluded, the defendants are entitled to judgment as a matter of law.

<u>DISCUSSION</u>

I.   MOTION TO EXCLUDE DR. WOLFSON'S EXPERT TESTIMONY

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge,
skill, experience, training, or education may testify
in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other
specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in
issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles
and methods; and
(d) the expert has reliably applied the principles and
methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, district courts are gatekeepers of expert evidence.   <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u> 509 U.S. 579,

-6-

589 (1993).  The trial judge must determine as an initial matter
whether the proffered witness is qualified to give the expert
opinion he seeks to express.  See Kumho Tire Co. v. Carmichael,
526 U.S. 137, 156 (1999); Daubert, 509 U.S. at 589.  To do so,
the court must assess whether the proffered expert has
"sufficient specialized knowledge to assist the jurors in
deciding the particular issues in this case."  Kumho, 526 U.S. at
156 (internal quotation marks omitted).  Although "a person who
holds a graduate degree typically qualifies as an expert in his
or her field," formal education in the subject or field is not a
prerequisite to testify as an expert.  Khairkhwa v. Obama, 793 F.
Supp. 2d 1, 11 (D.D.C. 2011); see also Fed. R. Evid. 702 (stating
that an expert may be qualified by "knowledge, skill, experience,
training, or education" (emphasis added)).  A proffered witness
who does not hold a specific academic degree may be qualified as
an expert if he has some degree of specialized knowledge
regarding the subject or a similar topic.  See Dyson v. Winfield,
113 F. Supp. 2d 44, 50 (D.D.C. 2000) ("[T]he key to qualifying
him as an expert is his knowledge, not his academic degree.");
see also Exum v. Gen. Elec. Co., 819 F.2d 1158, 1163-64 (D.C.
Cir. 1987).  A witness may also be qualified as an expert based
on his experience.  "If the witness is relying solely or
primarily on experience, then the witness must explain how that
experience leads to the conclusion reached, why that experience

is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note; cf. DL v. District of Columbia, 730 F. Supp. 2d 78, 81 (D.D.C. 2010) (holding that a proffered witness was not qualified as an expert based on his experience where the proponent "cited sparse evidence of his experience" and the expert "[conclusorily] stated that he ha[d] 35 years [of] experience, without further explanation of what that experience entail[ed]").

Rule 702 also places an obligation on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. Evidence is relevant if it will "'assist the trier of fact to understand the evidence or determine a fact in issue.'" Id. at 591 (quoting Fed. R. Evid. 702).[2]

---

[2] Dr. Wolfson's testimony is relevant to at least the plaintiffs' negligence and medical monitoring claims. A plaintiff bringing a negligence action under District of Columbia law must show: "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 793 (D.C. 2011). To be successful, a plaintiff asserting a cause of action for medical monitoring must prove the essential elements of a claim for medical monitoring.
   The elements of a claim for medical monitoring are (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent acts of the defendant; (2) as a proximate result of that exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease; (3) that increased risk makes periodic medical examinations reasonably necessary; and (4) monitoring and testing procedures exist which make the early detection and

-8-

Scientific testimony is reliable when it pertains to
scientific knowledge.  <u>Id.</u> at 589-90.  Determining whether the
testimony pertains to scientific knowledge

> forces the court to focus on "principles and
> methodology, not on the conclusions that they
> generate," [<u>Daubert</u>, 509 U.S.] at 595, and thus demands
> a grounding in the methods and procedures of science,
> rather than subjective belief or unsupported
> speculation.  <u>Id.</u> at 590; <u>Ambrosini v. Labarraque,</u> 101
> F.3d 129, 133 (D.C. Cir. 1996).

<u>Meister v. Med. Eng'g Corp.</u>, 267 F.3d 1123, 1127 (D.C. Cir.
2001).  Accordingly, scientific knowledge requires that the
"inference or assertion must be derived by the scientific
method."  <u>Daubert</u>, 509 U.S. at 590.  That is, the "[p]roposed
testimony must be supported by appropriate validation -- i.e.,
'good grounds,' based on what is known."  <u>Id.</u>  In determining
whether the grounds supporting the expert testimony are
scientifically valid, courts may consider "whether the theory or
technique had been tested, whether it had been subjected to peer
review and publication, the method's known or potential error
rate, and the method's general acceptance in the scientific

---

treatment of the disease possible and beneficial.
<u>Reed v. Philip Morris Inc.</u>, No. 96-5070, 1997 WL 538921, at *16
n.10 (D.C. Super. Aug. 18, 1997) (internal quotation marks
omitted).  Dr. Wolfson's testimony that the defendants did not
follow the directions on the Roundup label and his causation
opinions are relevant to the plaintiffs' negligence claims -- the
breach of duty and causation elements, respectively.
Dr. Wolfson's causation testimony is also relevant to the
plaintiffs' medical monitoring claims as is his medical
monitoring opinion.

community." <u>Meister</u>, 267 F.3d at 1127 (citing <u>Daubert</u>, 509 U.S. at 593-94).

"In general, Rule 702 has been interpreted to favor admissibility." <u>Khairkhwa</u>, 793 F. Supp. 2d at 10 (citing <u>Daubert</u>, 509 U.S. at 587; Fed. R. Evid. 702 Advisory Committee's note ("A review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule.")).  Nonetheless, the proponents of the evidence -- here, the plaintiffs -- bear the burden to prove that the expert testimony is reliable by a preponderance of the evidence. <u>Meister</u>, 267 F.3d at 1127 n.9.

> A.   <u>Expert testimony on proper mixture and aerial</u>
>      <u>application rate of Plan Colombia herbicide</u>

The plaintiffs assert that Dr. Wolfson is qualified to offer an expert opinion that the Plan Colombia herbicide contained "excessive concentrations of glyphosate and surfactant[,]" Wolfson Rpt. at 3; Pls.' Opp'n, Ex. 2 (Michael A. Wolfson Rebuttal Rpt. ("Wolfson Rebuttal Rpt.") at 7), because he is a physician and a specialist in occupational and environmental medicine, Pls.' Opp'n at 5.  Although Dr. Wolfson has impressive credentials, the plaintiffs have not demonstrated how his academic and professional experiences make him qualified to testify as to the proper concentration of glyphosate and surfactant in the Plan Colombia herbicide and application rate of the herbicide.  Dr. Wolfson's expert report states that he has

-10-

graduate degrees in pharmacology and public health and a medical degree. Wolfson Rpt., Ex. A at 1. The plaintiffs in their opposition simply recite Dr. Wolfson's degrees. Pls.' Opp'n at 5. But nothing the plaintiffs provide reflects that Dr. Wolfson's education was related to herbicides, weed biology or eradication, glyphosate, or a related field.

As to whether Dr. Wolfson's experience makes him qualified, the plaintiffs have not demonstrated that Dr. Wolfson's experience is a "sufficient basis" for his expert opinion.[3] In his expert report, Dr. Wolfson states that he is qualified to offer expert opinion testimony in this case because of his "extensive training and expertise in occupational and environmental medicine," which includes residency training and clinical practice. Wolfson Rpt. at 2. However, the plaintiffs do not show why Dr. Wolfson's residency training and clinical practice is a sufficient basis for his opinion, or whether Dr. Wolfson's "preparation is of a kind that others in the field would recognize as acceptable[,]" Kumho, 526 U.S. at 151, or how Dr. Wolfson's experience supports his conclusion that the Plan Colombia herbicide contained excessive concentrations of

_____

[3] If the plaintiffs rely upon Dr. Wolfson's experiences to qualify him to testify on the proper mixture of the Plan Colombia herbicide, Dr. Wolfson's deposition raises serious doubts as to the scope of Dr. Wolfson's knowledge gained from his experiences. See, e.g., Wolfson Dep. at 49:20-23 (testifying that he does not "have any knowledge one way or the other whether surfactants are routinely added to Roundup ULTRA").

glyphosate and surfactant.  Thus, the plaintiffs have failed to carry their burden to establish that Dr. Wolfson is qualified to offer expert testimony on whether the Plan Colombia herbicide contained an excessive concentration of glyphosate and surfactant or was applied at an excessive rate.

Moreover, the way that Dr. Wolfson concluded that the Plan Colombia herbicide contained excessive concentrations of glyphosate and surfactant and was applied at an excessive rate makes his expert opinion testimony improper and inadmissible. Dr. Wolfson's opinion that the Plan Colombia herbicide contained excessive concentrations of glyphosate and surfactant is based on a comparison of the Plan Colombia herbicide composition and application rate with the manufacturer's recommended concentrations and application directions on the Roundup Ultra label.  The composition and application rate of the Plan Colombia herbicide is undisputed.[4]  Thus, Dr. Wolfson used the simple methodology of comparing excerpts from the manufacturer's label

---

[4] The Plan Colombia herbicide was composed of 44% Roundup Ultra ("commercial glyphosate formulation"), 1% Cosmo-Flux 411F (a surfactant), and 55% water.  The Roundup Ultra was composed of 41% glyphosate, 15% surfactant (polyoxyethylene alkylamine ("POEA")), and 44% water.  See Chemicals Used for the Aerial Eradication of Illicit Coca in Colombia and Conditions of Application, U.S. Dep't of State (2002), http://www.state.gov/j/inl/rls/rpt/aeicc/13234.htm ("DOS Spray Report"); Letter from Stephen L. Johnson, Assistant Adm'r, EPA, to Colin L. Powell, Secretary, U.S. Dep't of State (Aug. 19, 2002), available at http://www.state.gov/j/inl/rls/rpt/aeicc/13237.htm.  The Plan Colombia herbicide was applied "to coca at the rate of 2.53 gallons per acre."  DOS Spray Report.

against the quantities and application rates of the Plan Colombia
herbicide.  However, offering this expert testimony is not proper
because "'the jury is just as competent to consider and weigh
[this] evidence as is an expert witness and just as well
qualified to draw the necessary conclusions therefrom[.]'"  Evans
v. Wash. Metro. Area Transit Auth., 674 F. Supp. 2d 175, 179-80
(D.D.C. 2009) (quoting Henkel v. Varner, 138 F.2d 934, 935 (D.C.
Cir. 1943)).  Since his conclusion is not based upon specialized
knowledge that would "help the trier of fact to understand the
evidence or determine a fact in issue," Fed. R. Evid. 702,
Dr. Wolfson's opinion would not be admissible.

    There are also at least two factors undermining the
reliability of Dr. Wolfson's proposed testimony.  First,
Dr. Wolfson admits that the Roundup Ultra label provided the sole
basis for his opinion that the concentration of glyphosate and
surfactant in the Plan Colombia herbicide and its application
rate was excessive.  Wolfson Dep. at 71:22-72:20, 78:23-79:8.
However, Dr. Wolfson did not use all of the relevant information
on the label in reaching his conclusion.  Instead, he based his
opinion on incomplete excerpts from the label.  For example,
Dr. Wolfson would testify that the application rate of the
glyphosate based herbicide used in the Plan Colombia spraying was
excessive based on the Roundup Ultra label which, according to
Dr. Wolfson, states that Roundup Ultra use should not exceed 1

-13-

quart per acre although, in exceptional circumstances, 1.5 quarts
may be used.  Wolfson Rebuttal Rpt. at 7-8.  Because the Plan
Colombia spraying applied 4.45 quarts of Roundup Ultra per acre,
Dr. Wolfson concludes that 3 to 4.5 times the recommended amount
of glyphosate was applied through the Plan Colombia aerial
spraying.  Id. at 8.  However, Dr. Wolfson bases his conclusion
on an excerpt of the label and, without explanation, ignores the
surrounding sections of the label.  The full label states, in
relevant part: "Unless otherwise specified, do not exceed 1 quart
of [Roundup Ultra] per acre. . . .  Refer to the individual use
area sections of this label for recommended volumes, application
rates and further instructions."  Pls.' Opp'n to DynCorp's Mot.
for Summ. J. Based on Lack of Necessary Expert Test., Ex. 4
(Michael Wolfson Expert Rebuttal Rpt., Ex. A at 2).  In his
deposition, Dr. Wolfson implied that he referred to the
individual use area sections of the label and "found what [he]
believe[d] to be the maximum concentration recommended anywhere
on the label[.]"  Wolfson Dep. at 58:11-17.  But he admitted that
the label "is so complex and detailed" that he may have missed
the appropriate section listing the maximum concentration of
Roundup Ultra that may be used in the Plan Colombia context.  Id.
The defendants presented evidence that Dr. Wolfson indeed did
miss the appropriate section.  They offer expert testimony by
Dr. Joseph M. DiTomaso that the appropriate individual use area

-14-

section on the label for woody plants, such as coca, provides
that Roundup Ultra should be applied at a rate of 2 to 5 quarts
per acre.  Defs.' App. (Joseph M. DiTomaso Expert Rpt. ("DiTomaso
Rpt.")) at 203.  Confronted with Dr. DiTomaso's expert opinion,
Dr. Wolfson stated that he had "no basis . . . on which . . . to
provide an opinion at all based on [the Roundup Ultra] label"
about whether the correct application rate for Roundup when used
for woody brush and trees is 2 to 5 quarts per acre.  Wolfson
Dep. at 65:3-8.

Second, Dr. Wolfson again relies on the Roundup Ultra label
for his opinion that the Plan Colombia herbicide contains
excessive amounts of surfactant.  The Roundup Ultra label states
that surfactant should not be added to a spray solution when
Roundup Ultra herbicide is the only pesticide used.  Wolfson Rpt.
at 3.  Dr. Wolfson reasoned that because "[t]he coca spray
mixture apparently contains Roundup Ultra as the only
pesticide/herbicide in the solution[,]" "the coca spray mixture
used by Plan Colombia, fails to follow [the] manufacturer's label
directions for the use of [Roundup Ultra]" since it added the
surfactant Cosmo-Flux 411F.  Id.  But Dr. Wolfson admitted that
he had not explored the significance of the instruction and did
not know whether the statement regarding adding surfactant was
required by the Environmental Protection Agency for safe use or
was optional.  Wolfson Dep. at 50:7-10.  Moreover, Dr. Wolfson

could not say whether Dr. DiTomaso was correct that the instruction was included on the label for business reasons rather than reasons of safety.  Id. at 50:11-18; see also DiTomaso Rpt. at 202 (stating that "manufacturers often include statements [such as those regarding adding surfactant to Roundup Ultra] in the product labeling . . . to remind the user that Roundup formulations already include a surfactant and to suggest (subtly or not) that it is unnecessary to purchase additional surfactants and additives (from other chemical manufacturers) to effectively control weeds and other undesired plants").  Dr. Wolfson also conceded that he did not know whether, despite the label, surfactants are routinely added to Roundup Ultra.  Wolfson Dep. at 49:20-23.  Thus, Dr. Wolfson's testimony is based not on scientific knowledge but on subjective belief and unsupported speculation that the directions he cited from the manufacturer's label are requirements for safe use of Roundup Ultra and should have been followed by the defendants in the Plan Colombia operation.  The plaintiffs, then, have not demonstrated that Dr. Wolfson's testimony regarding the excessive concentration of surfactant in the Plan Colombia herbicide would be reliable.

  B. Expert testimony on causation

    1. Expert qualifications

  The defendants assert that "'[s]imply having a medical degree or training is insufficient expertise to establish

causation.'"   Defs.' Mot. at 9 (quoting <u>Cunningham v. Masterwear,

Inc.</u>, No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832, at *10 (S.D.

Ind. Apr. 19, 2007).   They continue that Dr. Wolfson is not

qualified as an expert to testify as to specific or general

causation because "he is not an expert in epidemiology or

toxicology, the two fields of expertise relevant to the question

whether the Plan Colombia herbicide could cause the test

plaintiffs' alleged acute injuries or alleged increased risk of

cancer."   <u>Id.</u> at 9.   The plaintiffs counter that being a

toxicologist or epidemiologist is not required to be qualified to

offer expert testimony on causation and Dr. Wolfson's experience

qualifies him as an expert.   Pls.' Opp'n at 6.

Although the D.C. Circuit has not spoken on the

qualifications necessary to offer expert testimony in a toxic

tort case, cases in other districts provide guidance.   In

<u>Cunningham v. Masterwear, Inc.</u>, the defendant moved to strike

expert witnesses' testimony and reports regarding causation in a

toxic tort case.   The plaintiffs claimed that perch loroethylene

("PCE") exposure over the course of more than fifteen years

caused them to develop "chronic respiratory ailments and

headaches."   2007 WL 1164832, at *1.   The plaintiffs' experts

sought to testify that the PCE had caused the plaintiffs'

injuries.   <u>See id.</u> at *9.   The court explained that one of the

putative experts had experience only diagnosing and treating the

underlying ailments.  _Id._ at *10.  As such, the court concluded

that the witnesses were not qualified to "assess [the] genesis"

of the plaintiffs' ailments.  _Id._ (internal quotation marks

omitted).  The court did, however, leave open the possibility

that a different physician with more experience may be able to

testify as to causation.  _Id._ at *11 ("[I]n this entry the court

is not assuming that no physician can ever testify as to general

causation; rather, it is assuming only that not every doctor by

virtue of having a medical degree may testify as to general

causation in every case.").

        In _Morin v. United States_, 534 F. Supp. 2d 1179 (D. Nev.

2005), the plaintiff alleged that regular exposure to jet fuel

from a military air station caused her to develop a malignant

brain tumor.  _Id._ at 1181.  The plaintiff's only proffered expert

to testify as to causation was a practicing physician who

regularly diagnosed and treated patients with cancer.  _Id._ at

1185.  As in _Cunningham_, the court in _Morin_ distinguished between

the expert's experience diagnosing and treating the underlying

ailment and his experience determining the cause of the ailment,

and held that the licensed oncologist was not qualified to

testify as to the causal link between jet fuel and brain tumors

because he had "no expertise in toxicology, epidemiology, risk-

assessment, or environmental medicine."  _Id._  The guidance that

emerges from these cases is that an expert is qualified to

-18-

testify as to causation in a toxic tort case when he has
expertise to "assess [a disease's] genesis to a reasonable degree
of scientific certainty." Sutera v. Perrier Grp. of Am. Inc.,
986 F. Supp. 655, 667 (D. Mass. 1997).

This guidance mirrors approaches used in this district.  For
example, the court in Dyson considered whether a witness who was
not a physician could offer expert testimony that a drug given to
a pregnant patient had caused birth defects.  113 F. Supp. 2d at
50.  As happened in Cunningham and Morin, the court looked past
the witness's professional title and formal education and
considered whether the proffered expert had experience
identifying the effect of chemical exposure during pregnancy.
Id.

In his expert report, Dr. Wolfson describes his lengthy
career in occupational and environmental medicine.  Dr. Wolfson
also states that he has "rendered thousands of diagnoses and
opinions on the causation of disease involving complex issues of
toxic exposures" and, through his clinical practice, conducted
"environmental and occupational risk assessment and toxic
exposure evaluations[.]"  Wolfson Rpt. at 1-2.  Dr. Wolfson's
resume supports his statements.  Thus, although Dr. Wolfson does
not have any formal education in epidemiology or toxicology, his
expert report supports a finding that he has vast experience in
environmental medicine, conducting risk assessments, and

-19-

assessing the genesis of diseases caused by toxins.  As such, the plaintiffs have made an ample showing of Dr. Wolfson's qualifications as an expert to offer causation testimony.

      2.   Reliability

In a toxic tort case, general causation requires that the plaintiff "show that the toxicant in question is capable of causing the injury complained of[.]"  Young v. Burton, 567 F. Supp. 2d 121, 138 (D.D.C. 2008) (internal quotation marks omitted).  Specific causation requires that the plaintiff "prove that the toxicant in fact did cause that injury in the present case[.]"  Id.  Dr. Wolfson proposes to testify that the Plan Colombia herbicide can and did cause the plaintiffs' acute injuries.  He would also testify that exposure to glyphosate and glyphosate-based herbicides as a result of aerial spraying can cause certain chronic injuries, and very likely placed the plaintiffs at significant risk for the development of cancers in the future.  Wolfson Rpt. at 3.

In toxic tort cases, there are two common methods experts apply to draw causation conclusions.  First, an expert may rely on "a temporal relationship between exposure to the toxin and subsequent adverse health effects" to establish both general and specific causation.  See Young, 567 F. Supp. 2d at 128.  In compelling circumstances, a temporal relationship between exposure to a toxin and a plaintiff's injury alone is sufficient

-20-

to establish general causation.  See Cavallo v. Star Enterprise,
892 F. Supp. 756, 773-74 (E.D. Va. 1995), aff'd in relevant part,
rev'd in part, 100 F.3d 1150 (4th Cir. 1996).  For example, a
temporal relationship may be "so compelling as to dispense with
the need for reliance on standard methods of toxicology" where a
person is exposed to a large amount of chemical X and
"immediately thereafter developed symptom Y[.]"  Id.  Also, if a
chemical is introduced into an environment and all of the people
"exposed immediately develop the same adverse reaction, then the
episode itself may be sufficiently indicative of causation."  Id.
However, "[i]n the absence of an established scientific
connection between exposure and illness, or compelling
circumstances . . . , the temporal connection between exposure to
chemicals and an onset of symptoms, standing alone, is entitled
to little weight in determining causation."  Moore v. Ashland
Chem. Inc., 151 F.3d 269, 278 (5th Cir. 1998); see also Young,
567 F. Supp. 2d at 128.  This is because "[d]rawing such a
conclusion from temporal relationships leads to the blunder of
the post hoc ergo propter hoc fallacy."[5]  McClain v. Metabolife

---

[5] "The post hoc ergo propter hoc fallacy assumes causality from
temporal sequence.  It literally means 'after this, because of
this.'  Black's Law Dictionary 1186 (7th ed. 1999).  It is called
a fallacy because it makes an assumption based on the false
inference that a temporal relationship proves a causal
relationship."  McClain v. Metabolife Int'l, Inc., 401 F.3d 1233,
1243 (11th Cir. 2005).

Int'l, Inc., 401 F.3d 1233, 1243 (11th Cir. 2005) (citing Ohio v. U.S. Dep't of the Interior, 880 F.2d 432, 473 (D.C. Cir. 1989)).

An expert may also rely on a temporal relationship between the exposure to a toxin and onset of symptoms to form a specific causation opinion.  For example, in Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999), the court of appeals allowed expert testimony that relied in part on the temporal proximity between exposure to the toxin in the plaintiff's workplace and the plaintiff's injury.  In Westberry, there was no dispute that inhalation of high levels of the toxin at issue could cause sinus conditions similar to those suffered by the plaintiff and there was evidence that the plaintiff had been substantially exposed to the toxin.  Id.  The plaintiff's proffered expert was the plaintiff's treating physician, the plaintiff's injury began shortly after exposure to the toxin, and the expert had "experimented with keeping [the plaintiff] out of work and noticed that his sinus condition improved when he was not working but worsened when he returned."  Id. at 265; cf. Roche v. Lincoln Prop. Co., 278 F. Supp. 2d 744, 765 (E.D. Va. 2003) (finding that expert testimony was inadmissible because, unlike in Westberry, the doctor treated the plaintiff nine months after alleged exposure to mold, the doctor had not treated the plaintiff prior to exposure, and the doctor did not conduct experiments where the plaintiff's injury was observed when the

-22-

plaintiff was in the allegedly toxic environment and when the plaintiff was removed from that environment).  In that context, the court held that the expert's opinions satisfied Daubert even though the expert did not rely on "precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure[.]"  Westberry, 178 F.3d at 264-65.

The second common expert method used to establish general and specific causation is to "present scientifically-accepted information about the dose-response curve for the toxin which confirms that the toxin can cause the health effects experienced by the plaintiff at the dosage [the] plaintiff was exposed to." Young, 567 F. Supp. 2d at 128.  If an expert uses this methodology, "'scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case.'"  Id. (quoting Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999) (citing Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1106 (8th Cir. 1996))).  This is the "most widely-used method" to demonstrate causation in toxic tort cases.  Id.  As such, "[t]he expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology."  McClain, 401 F.3d at 1241-42.

-23-

Dr. Wolfson admitted that he could not opine as to "the dose
and duration of exposure to Plan Colombia herbicide spray that
will be required to cause any one of the medical conditions for
which the plaintiffs complain[.]"  Wolfson Dep. at 210:20-25.[6]
Instead, Dr. Wolfson purports to rely on several studies to
support his general causation opinions that the Plan Colombia
herbicide can cause the plaintiffs' acute and chronic injuries.
See Wolfson Rpt. at 2, 5-6; Wolfson Rebuttal Rpt. at 14-18.
Dr. Wolfson bases his specific causation opinion that the Plan
Colombia herbicide did cause the plaintiffs' injuries on the
plaintiffs' medical histories, the plaintiffs' depositions and
questionnaires, a report by Dr. Adolfo Maldanado, and the
temporal relationship between the plaintiffs' injuries and their
exposure to the herbicide.

> a.   *Acute injuries*

The defendants argue that Dr. Wolfson's general causation
opinion is unreliable because it is based on "'studies of
patients who try to commit suicide' by directly ingesting large
amounts of the concentrated Roundup product."  Defs.' Mot. at 19
(quoting Wolfson Dep. at 124:20-25).  The plaintiffs counter that
it was reliable for Dr. Wolfson to base his opinion on high-level

---

[6] In his deposition, Dr. Wolfson stated that he thought that
"evidence regarding dose and route of exposure" was unnecessary
"to reach an opinion that exposure to Plan Colombia herbicide can
cause a medical impairment to a human being[.]"  Pls.' Opp'n to
DynCorp's Mot. for Summ. J. Based on Lack of Necessary Expert
Test., Ex. 1 (Michael A. Wolfson Dep. at 154:18-155:4).

exposure studies.  Pls.' Opp'n at 15-16.  Drawing inferences and

extrapolating from studies of high-level exposure to a toxin is

not a per se unreliable methodology.  See, e.g., City of

Greenville v. W.R. Grace & Co., 827 F.2d 975, 980 & n.2 (4th Cir.

1987).  However, it does require that the expert explain his

methodology, such as how he "extrapolate[d] the risk downward

from results obtained in studies involving high-level exposures."

See id. at 980 n.2.  Here, Dr. Wolfson does not opine that there

is no "threshold" level[7] for glyphosate or other toxins in the

Plan Colombia herbicide to cause acute injuries.  If there is a

dose-response relationship between health effects and glyphosate

exposure, then Dr. Wolfson must have made some inferences in

drawing conclusions regarding the plaintiffs' alleged injuries

from exposure to the Plan Colombia herbicide through drift from

the high-level exposure studies.  However, the plaintiffs fail to

offer any evidence explaining or showing "a scientifically valid

---

[7] "For agents that produce effects other than through mutations,
it is assumed that there is some level that is incapable of
causing harm.  If the level of exposure was below this no
observable effect, or threshold, level, a relationship between
the exposure and disease cannot be established."  Fed. Judicial
Ctr., Reference Manual on Scientific Evidence 669 (3d ed. 2011).
For some agents, such as mold, there is no "threshold" level,
meaning that "certain susceptible people can suffer injuries from
being exposed to mold at very low levels."  Ferguson v. Riverside
Sch. Dist. No. 416, No. CS-00-0097-FVS, 2002 WL 34355958, at *6
(E.D. Wash. Feb. 6, 2002).  If the toxin does not have a
"threshold level," "the 'dose-response' concept does not play an
important part in his determining causation."  Id.; see also
Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 265 (6th Cir.
2001).

-25-

link between the sources or studies consulted and the conclusion
reached." Cavallo, 892 F. Supp. at 762.  Thus, the plaintiffs
did not meet their burden to show that Dr. Wolfson's general
causation opinion, based on high-level exposure studies, is
supported by a reliable methodology.

In his deposition, Dr. Wolfson testified that the suicide
studies were only "part of the basis for [his] opinion" and that
he "integrated the information about the signs and symptoms of
disease from those studies in a whole body of evidence that's
available about the effects" of glyphosate-based herbicides.
Wolfson Dep. at 124:11-25.  In their opposition, the plaintiffs
also stated that Dr. Wolfson did not rely "exclusively" on
studies of suicide attempts and data sheets regarding exposure by
ingestion to form the basis of his general causation opinion.
Pls.' Opp'n at 15-16.  Despite their representation that
Dr. Wolfson relied on other studies, the only alternative
methodology offered by the plaintiffs is that Dr. Wolfson
"evaluated relevant peer-reviewed scientific and medical
literature including, but not limited to, material regarding
toxicological, environmental, and human health effects of
herbicides, Glyphosate (G), Roundup and surfactants." Id. at 7-
8; see also Wolfson Rpt. at 2.

Rather than identifying the specific scientific reports that
Dr. Wolfson relied on to reach his general causation opinion, the

plaintiffs make only generic references to reports that support Dr. Wolfson's general causation opinion.  Similarly, Dr. Wolfson's expert report and expert rebuttal report do not specifically identify the reports that support Dr. Wolfson's general causation opinions and do not discuss the conclusions the reports and texts reached.  Such a generalized and non-specific description falls short of the plaintiffs' burden to explain with specificity the expert witness's methodology, show that the expert's testimony is based on a reliable methodology, and establish that the expert reliably applied the methodology to the facts of the case.  <u>See</u> Fed. R. Evid. 702.  Moreover, Dr. Wolfson did not base his opinion on any peer-reviewed study that states that exposure to a glyphosate-based herbicide through drift can cause any of the medical conditions complained of by the test plaintiffs in this case.  Wolson Dep. at 141:21 to 142:2. Furthermore, some of the studies Dr. Wolfson cites in his expert report, appear to be advocacy pieces published in non-peer-reviewed journals.  <u>See, e.g.</u>, Caroline Cox, <u>Glyphosate, Part 1: Toxicology</u>, 15 J. Pesticide Reform 14 (1995); Caroline Cox, <u>Glyphosate, Part 2: Human Exposure and Ecological Effects</u>, 15 J. Pesticide Reform 14 (1995).  Accordingly, the plaintiffs have not met their burden to show, by a preponderance of the evidence,

-27-

that Dr. Wolfson's expert general causation opinion regarding the plaintiffs' acute injuries is reliable.[8]

        b.    *Chronic injuries*

             i.   *General causation*

Dr. Wolfson states in his expert report that "[t]he exposure of the plaintiffs to [the Plan Colombia] herbicide[], as a result of aerial spraying, very likely places them at a significant

---

[8] "In the absence of sufficient proof of general causation, it goes without saying that plaintiffs cannot establish specific causation." Young, 567 F. Supp. 2d at 139.  However, if they could, Dr. Wolfson's specific causation testimony would not be excludable on the ground that it would be based upon information given to him and not personal examinations of the plaintiffs. See Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of *or* personally observed." (emphasis added)); id., Advisory Committee's note (stating that an expert may rely "on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors"); Peteet v. Dow Chem. Co., 868 F.2d 1428, 1432 (5th Cir. 1989) ("A personal examination of the person or object of the expert's testimony is not required under [Rule] 703.").  The plaintiffs contend that Dr. Wolfson reliably based his specific causation opinion on the plaintiffs' testimony regarding the acute symptoms they developed immediately or soon after the spraying, the plaintiffs' questionnaires reporting exposure to the Plan Colombia herbicide and other injuries, and Dr. Maldonado's report, which reflected that individuals living near the areas that were fumigated suffered acute injuries similar to those reported by the test plaintiffs. Pls.' Opp'n at 8-12.  Given the immediacy of the plaintiffs' injuries and the consistent reports from others in the region as reported by Dr. Maldonado, Dr. Wolfson concluded that exposure to the Plan Colombia herbicide likely caused the test plaintiffs' injuries.  Pls.' Opp'n at 11; see also Wolfson Rebuttal Rpt. at 4-5.  Thus, Dr. Wolfson's specific causation opinion follows from the temporal relationship between the plaintiffs' exposure to the Plan Colombia herbicide as reported by the plaintiffs in their depositions and questionnaires and corroborated by Dr. Maldonado's report and medical histories.

-28-

increased risk for the development of cancers in the future."
Wolfson Rpt. at 3.  Although the plaintiffs' "description" of
Dr. Wolfson's methodology suffers from many of the same
shortcomings as his general causation opinion for the plaintiffs'
acute injuries, Dr. Wolfson does specifically identify a few
peer-reviewed studies to support his conclusion that glyphosate-
based herbicides have carcinogenic effects.  See Wolfson Rebuttal
Rpt. at 3 & nn.3-4; Wolfson Dep. at 400:15-21.

However, a brief review of the cited studies demonstrates
that the plaintiffs have not shown that Dr. Wolfson's testimony
is reliable.  For example, the plaintiffs fail to reveal how,
based on the studies alone, Dr. Wolfson reached the conclusion
that exposure to the Plan Colombia herbicide increased the
plaintiffs' risks for developing non-Hodgkins lymphoma.
Dr. Wolfson cites several studies including studies by Eriksson,
et al., Hardell and Eriksson, and De Roos, et al.  Eriksson and
his colleagues conducted a population-based control study and
concluded that "Glyphosate was associated with a statistically
significant increased [odds ratio] for lymphoma[.]"  Mikael
Eriksson et al., Pesticide exposure as risk factor for non-
Hodgkin lymphoma including histopathological subgroup analysis,
123 Int'l J. Cancer 1657, 1662 (2008).  The Hardell and Eriksson
study concluded that their study population who had been exposed
to glyphosate was too low to draw any definite conclusions.

Lennart Hardell & Mikael Eriksson, A Case-Control Study of Non-Hodgkin Lymphoma & Exposure to Pesticides, 85 Cancer 1353, 1358 (1999).  The De Roos study found an association between multiple myeloma incidence and glyphosate, but concluded that "the available data provided evidence of *no* association between glyphosate exposure and NHL incidence."  Anneclaire J. De Roos et al., Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envtl. Health Persp. 49, 53 (2005) (emphasis added).  Dr. Wolfson does not explain why he decided to credit Eriksson's results and dismiss De Roos's results regarding non-Hodgkin lymphoma.  Also, the Eriksson study found that there is a dose-response effect between glyphosate and lymphoma but Dr. Wolfson does not opine as to the plaintiffs' exposure.  Thus, the plaintiffs have not demonstrated that the results of the Eriksson study apply to the facts of this case.  Because the plaintiffs have not shown that Dr. Wolfson's general causation opinion for the plaintiffs' chronic injuries is reliable, his testimony would be inadmissible.[9]

ii.  *Specific causation*

The plaintiffs do not explain Dr. Wolfson's methodology for his specific causation opinion regarding the plaintiffs' chronic injuries and his methodology cannot be gleaned from his expert

---

[9] Moreover, in his deposition, Dr. Wolfson conceded that he had not seen any epidemiological studies that found an increased risk of cancer caused by exposure to glyphosate by spray drift. Wolfson Dep. 400:9-14.

-30-

report or rebuttal report.  Because the plaintiffs have not met
their burden to show that Dr. Wolfson's testimony on specific
causation regarding the plaintiffs' chronic injuries is reliable,
this testimony will be excluded.

     C.   Expert testimony on medical monitoring

     Dr. Wolfson opines that a medical "monitoring regime is
necessary and indicated for an exposed . . . group[] of
individuals such as [the] plaintiffs, within a reasonable degree
of medical certainty" because the plaintiffs are at an increased
risk for significant adverse health effects in the future.
Wolfson Rpt. at 4.  The plaintiffs suggest that Dr. Wolfson's
education and experiences qualify him as an expert.  Pls.' Opp'n
at 5-6.  However, the plaintiffs offer no further explanation as
to how Dr. Wolfson's education qualifies him to offer such
testimony or how his experience caused him to reach his
conclusion.  Conclusory statements that an expert is qualified
because of his education or experience is insufficient for a
court to find that the witness is indeed qualified to offer his
expert opinion.  See DL, 730 F. Supp. 2d at 81.  Similarly,
neither the plaintiffs nor Dr. Wolfson offer any explanation or
evidence regarding the reliability of Dr. Wolfson's methodology.
Because the plaintiffs have not met their burden to show that
Dr. Wolfson is qualified and that his testimony is reliable,
Dr. Wolfson's medical monitoring testimony is inadmissible.

II.  MOTION FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Memorandum Opinion entered on February 7, 2013 determined that the plaintiffs must offer expert testimony to prove general causation for the plaintiffs' acute and chronic injuries, and specific causation for the plaintiffs' chronic injuries.  Mem. Op. entered Feb. 7, 2013 at 10, 17.  Since Dr. Wolfson is the plaintiffs' sole expert, and his general causation testimony regarding the plaintiffs' acute and chronic injuries and his specific causation testimony regarding the plaintiffs' chronic injuries is inadmissible, the plaintiffs offer nothing else to establish that the defendants' aerial spraying caused their injuries.  Thus, the defendants' motion for summary judgment will be granted.

## CONCLUSION

The plaintiffs failed to show by a preponderance of the evidence that Dr. Wolfson's expert opinion testimony on the proper mixture and application rate of the Plan Colombia herbicide, general causation regarding the plaintiffs' acute and chronic injuries, specific causation regarding the plaintiffs' chronic injuries, and need for medical monitoring is admissible. However, Dr. Wolfson's specific causation opinion regarding the

-32-

plaintiffs' acute injuries is not excludable.  Thus, the defendants' motion to exclude Dr. Wolfson's expert testimony will be granted in part and denied in part.  Without the plaintiffs' sole expert witness's general causation opinions regarding the plaintiffs' acute and chronic injuries and his specific causation opinion regarding the plaintiffs' chronic injuries, the plaintiffs cannot establish causation as a matter of law, and summary judgment will be entered for the defendants.  A final Order accompanies this Memorandum Opinion.

SIGNED this 15th day of February, 2013.

_____
RICHARD W. ROBERTS
United States District Judge