## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Venancio Aguasanta Arias,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **Case No. 1:01cv01908 (ESH)** |
| **DynCorp,** *et al.*, | ) | **REDACTED** |
| **Defendants.** | ) | |
| **Nestor Ermogenes Arroyo Quinteros,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **Case No. 1:07cv01042 (ESH)** |
| **DynCorp,** *et al.*, | ) | **(Cases consolidated for case management and discovery)** |
| **Defendants.** | ) | **REDACTED** |

### MEMORANDUM OPINION

Plaintiffs, over two thousand Ecuadorian citizens, allege that airplanes sprayed them and their property with the herbicide glyphosate during an anti-drug fumigation campaign conducted by an American company, defendant DynCorp, in consultation with the U.S. Department of State. Two separate cases—*Quinteros v. DynCorp,* Case No. 07-cv-1042 and *Arias v. DynCorp,* Case No. 01-cv-1908—have been consolidated in this litigation, and the claims of twenty test plaintiffs selected for initial adjudication. After the D.C. Circuit remanded the case with only three claims remaining (battery, intentional infliction of emotional distress (IIED), and nuisance), *Arias v. DynCorp,* 752 F.3d 1011 (D.C. Cir. 2014), it was reassigned to this Court.

Defendants now move for summary judgment as to the twenty test plaintiffs' three remaining common law claims, and ask that the Court's decision bind the other 1,998 non-test plaintiffs. (Defs.' Motion for Summary Judgment, December 14, 2014 [*Quinteros* ECF Nos. 362 (Redacted) & 363 (SEALED); *Arias* ECF Nos. 414 (Redacted) & 415 (SEALED)] ("Defs.' Mot.").)

For the following reasons, the Court grants the Motion in part and denies it in part.

## BACKGROUND

Since the late 1990s, the United States and Colombia have cooperated in a program known as "Plan Colombia," which includes a variety of policies designed to combat Colombian drug cartels. The Department of State hired DynCorp to help eradicate Colombian cocaine and heroin poppy plantations by using airplanes to spray aerial fumigants over Colombian drug farms. *See Arias v. DynCorp,* 856 F. Supp. 2d 46, 49 (D.D.C. 2012). According to plaintiffs, however, the planes also released a "fumigant that is harmful to humans, animals, and plants other than cocaine and opium poppies" onto plaintiffs' lands in the Sucumbios province of Ecuador, near the border with Colombia. *Id.*[1]

On September 11, 2001, plaintiffs filed a putative class action on behalf of all Ecuadorians who lived within ten miles of the Colombian border. (*See* Compl. [*Arias* ECF No. 1] ("*Arias* Compl.").) The *Arias* plaintiffs allege that glyphosate drifted across the border from Colombia and landed on their properties and bodies, and that the planes themselves actually crossed the border into Ecuador and sprayed individuals from directly overhead. In 2006 and

---

[1] It is undisputed that DynCorp is the prime contractor with the U.S. government and is responsible for performance of all obligations under the contract, including training, equipping, and directly supervising all pilots flying Plan Colombia missions. (Pls' Statement of Undisputed Material Facts, March 2, 2015 [*Arias* ECF No. 417] ("Pls' SUMF").)

2007, additional cases were filed in the Southern District of Florida, on behalf of individuals now referred to as the "*Quinteros* Plaintiffs." Those cases were transferred to this district on May 23, 2007, where they were consolidated with the *Arias* lawsuit and assigned to then Chief Judge Richard Roberts.[2]   At that point, over three thousand plaintiffs became active participants in the consolidated litigation, and the *Arias* plaintiffs dropped their class action demand. (First Am. Compl., March 24, 2008 [*Arias* ECF No. 66].)

Due to the enormous number of plaintiffs, the district court pursued a test plaintiff case management framework to facilitate global resolution. In November 2007, plaintiffs proposed twenty individuals for a first phase of adjudication, including sixteen adults and four minors. (*See* Joint Rule 16.3 Statement, Nov. 19, 2007 [*Quinteros* ECF No. 19].)   The parties then proceeded to conduct fact and expert discovery targeting the claims of the twenty test plaintiffs, which closed in May 2011.

In 2013, the district court granted summary judgment in favor of defendants. *Arias v. DynCorp*, 928 F. Supp. 2d 1 (D.D.C. 2013). Plaintiffs appealed. The D.C. Circuit affirmed the dismissal of all claims for personal injury and property damages, due to plaintiffs' failure to substantiate them with expert testimony as to general causation; however, it also found that expert testimony was not necessary to substantiate the three common law claims that do not depend on demonstrations of physical harm: battery, IIED, and nuisance. *Arias v. DynCorp*, 752 F.3d 1011, 1018 (D.C. Cir. 2014). Following remand, the post-appeal case is considerably narrower, consisting of 2,018 plaintiffs (including the group of test plaintiffs) and three remaining common law claims.

---

[2] Then Chief Judge Roberts presided over the case until his retirement in March 2016, after which it was reassigned to this Court.

Defendants moved for summary judgment as to the plaintiffs' remaining three common law claims on December 15, 2014.  On March 2, 2016, plaintiffs filed their Opposition, including a notification that test plaintiff Edgar Sandoval had recently died.  (Pls.' Opposition to Mot., March 2, 2015 [*Quinteros* ECF No. 365, *Arias* ECF No. 417] at 2 n.2 ("Pls.' Opp.").)[3] Defendants then filed a motion on March 11, 2016, seeking leave to amend their Answer to add a statute of limitations defense.  (*See* Motion to Reinstate the Defendants' August 11, 2011 Motion for Leave to Amend Their Answer to the *Quinteros* Plaintiffs' First Amended Consolidated Complaint [*Quinteros* ECF No. 366].)  Defendants' Reply in Support of their Motion for Summary Judgment was filed on April 16, 2016.  After this Court was reassigned the *Arias-Quinteros* case on April 6, 2016, it held a Motions Hearing on July 15, 2016.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate when a party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Once the party seeking summary judgment informs the court of the basis for its motion and identifies those parts of the record that demonstrate the absence of a genuine issue of material fact, *id.* at 323, the burden shifts to the nonmoving party, who must offer more than a "mere . . . scintilla of evidence" to support its claims.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

---

[3] Although plaintiffs indicated that they were planning to move pursuant to Federal Rule of Civil Procedure 25(a) to substitute a party to prosecute Mr. Sandoval's claim, no such motion has been filed at this time.  Thus, because ninety days have passed since notification of Mr. Sandoval's death, the Court must dismiss his test claim in its entirety.  *See* Fed. R. Civ. P. 25(a) ("If the motion [to substitute] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.").

(1986). "Although the finder of fact may draw inferences from the evidence, they must be reasonably probable and based on more than speculation." *Rogers Corp. v. EPA,* 275 F.3d 1096, 1103 (D.C. Cir. 2002) (internal citation and quotation marks omitted). "The summary judgment standard requires that the Court construe the facts and make all inferences in the plaintiffs' favor, but it does not command the Court to credit as true naked assertions lacking any basis in the record." *Ross v. DynCorp*, 362 F. Supp. 2d 344, 361 (D.D.C. 2005).

## II. ADJUDICATION OF TEST PLAINTIFFS' CLAIMS

The recent death of Edgar Sandoval (and plaintiffs' failure to submit a Rule 25 motion within ninety days of notification of death) leaves nineteen test plaintiffs.[4] As an initial matter, the Court considers whether adjudication of these nineteen test plaintiffs' claims affects the prospects of the other 1,998 non-test plaintiffs. Defendants argue that these non-test plaintiffs have consented to be bound by the Court's findings as to the legal sufficiency and timeliness of the test claims. Defendants are not simply suggesting that adjudication of the test claims extends to common issues impacting general liability and causation. Instead, they insist that all rulings—from the timeliness of a test plaintiff's cause of action (Defs.' Mot. at 22-24), to specific causation, damages, and case-by-case details such as whether DynCorp's herbicide contacted the skin of a test plaintiff (*id.* at 3, 13, 19-20) have the power to extinguish thousands of non-test plaintiffs' causes of action.

Even if such an extraordinary arrangement did not already strike the Court as implausible and unfair, if not unconstitutional, the Court also cannot find any evidence of its existence in the record. When asked at oral argument to provide the Court with specific evidence that Judge Roberts had intended such an unprecedented framework, defense counsel

---

[4] *See* note 3 (citing Rule 25(a) as grounds for dismissal of Mr. Sandoval's claim), *supra.*

was unable to do so. (*See* Oral Argument, July 15, 2016, Tr. at 24.) On the contrary, it appears

that the perfectly reasonable purpose of this case management plan was to adjudicate the factual

sufficiency of a group of test claims prior to subjecting thousands of other claims to discovery,

summary judgment briefing, and trial. The court discussed the test plaintiff approach at a status

conference in 2008, noting its purpose was "to give everybody a broad idea of what we have."

(Pls.' Opp., Ex. A, Nov. 25, 2008, Tr. at 27-28.)   The court encouraged the parties to select

some kind of sample to "narrow[ ] down the number of . . . test trials or identify[ ] in some

realistic way what playing field [they] should be on with respect to potentially discussing . . .

global settlement." (*Id.* at 28.) At a 2009 status conference, the court advised plaintiffs to

select a "mix" of strong and weak cases to avoid any delay in "see[ing] how the weak cases

play out and what impact that may eventually have on any theoretical settlement discussions."

(Pls.' Opp, Ex. B, July 17, 2009, Tr. at 36.) Then, at a 2010 status conference, the court again

clearly indicated that the test plaintiff group would be litigated first:

> The aim has been in this . . . litigation to identify a test group of plaintiffs and
> to prepare the cases potentially for trial . . . *and then once the results of the trial
> are in for the test group of plaintiffs, allow those results to inform the future
> direction of case efforts,* be it toward settlement or . . . for additional trials.

(*Id.*, Ex. C, Apr. 30, 2010 Tr. at 4:3-10 (emphasis added).) Following the establishment of this

framework, DynCorp narrowed its discovery efforts to focus on the test plaintiffs. No non-test

plaintiffs were deposed.

It thus appears that Judge Robert's intent was simple and unremarkable for this type of

mass toxic tort case: to litigate the claims of a group of test plaintiffs in the hopes of facilitating a

global resolution for the remaining plaintiffs.[5]

---

[5] Although the D.C. Circuit affirmed the dismissal of claims relating to physical injury and crop
damage for *all* plaintiffs in the case (not only test-plaintiffs), it noted that plaintiffs had failed to

Moreover, extending the resolution of individual issues to bind non test-plaintiffs would be contrary to law.  Certainly, there are numerous examples of courts using "bellwether" plaintiffs to resolve common issues of liability and general causation, but binding large populations of plaintiffs to the prospects of a test group on issues like timeliness and damages would strain the limits of due process.  *See In re Chevron USA*, 109 F.3d 1016, 1017 (5th Cir. 1997) (in oil spill case with over three thousand plaintiffs and 30 test plaintiffs, only general causation and common liability issues may bind non-test plaintiffs); *Allen v. U.S.*, 527 F. Supp. 476, 490 (D. Utah 1981) (rejecting "wholesale" timeliness determination for hundreds of plaintiffs and holding that "[e]ach individual plaintiff . . . is lawfully entitled to an individualized determination of the statute of limitations issue"); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 309 (S.D. Ala. 2006) (agreeing with DynCorp defendants that their "limitations defense weighs against class certification because of its individual-specific nature").[6]

Accordingly, the Court's present task is limited to evaluating defendants' Motion with respect to the claims of the nineteen remaining test plaintiffs selected by the parties.

---

preserve for appeal their argument that the ruling should not be extended to the non-test plaintiffs.  *Arias v. Dyncorp*, 752 F.3d 1011, 1016 (D.C. Cir. 2014).  The Court of Appeals actually expressed doubt that the other plaintiffs had consented to be bound by the outcome of the test litigation.  *Id.*  Moreover, the dismissal of the physical damage claims was a matter of general causation germane to all plaintiffs, due to the plaintiffs' failure to provide expert testimony in a toxic tort case.  *See id.* at 1016 n.1 ("The distinction [between general causation and specific causation] is important, because if the plaintiffs cannot show general causation, that is a reason to dismiss *all* of the crop damage claims, whereas proof of specific causation might be expected to vary from case to case.").

[6] In fact, defendants themselves stated that a statute of limitations defense "would of course be *raised on a case-by-case, plaintiff-by-plaintiff basis* based on the date(s) of an individual plaintiff's exposure and injury" when they first requested permission to amend their Answer to include it as an affirmative defense. (Defs.' Reply in Support of their Motion Seeking Leave to Amend, Sept. 1, 2011 [*Quinteros* ECF No. 227] at 8.)

### III. STATUTE OF LIMITATIONS

Defendants argue that the adult test plaintiffs' remaining common law claims are barred by the applicable statutes of limitations for Battery, IIED, and Nuisance. (Defs.' Mot. at 20.) Plaintiffs counter that defendants have forfeited their statute of limitations defense by not pleading it as an affirmative defense in any of the five separate Answers and Amended Answers it has filed in this consolidated litigation. (*See* Answer, August 29, 2007 [*Arias* ECF No. 54]; Amended Answer, Oct. 15, 2007 [*Arias* ECF No. 57]; Answer to Amended Compl., March 31, 2008, [*Arias* ECF No. 67]; Answer, Sept. 28, 2007 [*Quinteros* ECF No. 16; Answer to Amended Compl., April 14, 2008 [*Quinteros* ECF No. 24].)

"Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto." *Day v. McDonough*, 547 U.S. 198, 202 (2006). The D.C. Circuit has made clear that "Rule 8(c) means what it says: a party must first raise its affirmative defenses in a responsive pleading *before* it can raise them in a dispositive motion." *Harris v. Secretary, U.S., Dep't of Veterans Affairs*, 126 F.3d 339, 345 (D.C. Cir. 1997) (emphasis added); Fed. R. Civ. P. 8(c)(1) (responsive pleadings "must affirmatively state any . . . affirmative defense, including . . . statute of limitations"). The pleading requirement of Rule 8(c) "gives the opposing party notice of the defense of untimeliness and permits the party to develop in discovery and to argue before the District Court various responses to the affirmative defense." These responses could include, for example, "facts and legal arguments that require the tolling of the statute, whether by action of law, by agreement of the parties, or by equitable means." *Id.* at 343. Rule 15 provides a mechanism whereby a party who has failed to plead an affirmative defense may cure his error. "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182 (U.S. 1962).

As discussed above, the procedural history of this case is not typical. About four years after filing their initial Answer in the *Quinteros* case, and following the close of discovery in May 2011, defendants first sought leave to amend it to include a statute of limitations defense on August 11, 2011. Plaintiffs opposed the motion on multiple bases, including the fact that a statute of limitations defense would prejudice them, requiring additional fact-gathering as to equitable tolling theories after discovery had already closed. Defendants' only real explanation for their delay was that they had only recently learned the dates when the twenty test plaintiffs had alleged injuries from deposition testimony. (Defs.' Reply in Support of Motion Seeking Leave to Amend, Sept. 1, 2011 [*Quinteros* ECF No. 227] at 10.) The court ultimately denied defendants' motion as moot after it granted their motion for summary judgment. (*Quinteros* ECF No. 345 at 2.)

After the D.C. Circuit remanded the case to the district court, defendants raised their statute of limitations argument in the instant Motion for Summary Judgment. After plaintiffs noted in their March 2, 2015 Opposition that defendants had never bothered to renew their Motion to Amend, let alone been *granted* leave to amend their Answer, defendants filed a motion to add the statute of limitations defense to their Answer on March 11, 2015.

The Court is mindful that the Rules were not designed to function as formalistic barriers to proper decision-making and that they "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." *Harris*, 126 F.3d at 344

9

(quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)). In this case, however, the Court is not

evaluating "one misstep," and cannot view defendants' repeated failures to cure the

deficiencies in their Answers as anything but undue delay. Defendants have filed five separate

Answers and Amended Answers in the *Quinteros* and *Arias* litigation. They failed to include a

statute of limitations defense in either their 2007 Answer to the *Quinteros* Complaint or the

2008 Answer to the *Quinteros* Amended Complaint. Their first request that the court grant

them permission to add such a defense came in 2011—four years after their initial Answer.

Their second attempt came over seven years after their Answer, and defendants did not seek

leave to amend until raising the statute of limitations argument in a dispositive motion. *See*

*Jones v. Mukasey*, 565 F.Supp.2d 68, 74 (D.D.C. 2008) (holding it to be "improper" for

defendant to raise an affirmative defense "for the first time in his summary judgment motion");

*see also Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 860 (D.C. Cir. 2015) (holding that a

request to amend an Answer to add new defenses "simply came too late," having "arrived four

years after litigation began"); *Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir.

2012) (finding undue delay when a motion to amend arrived five years after the initial

complaint); *Doe v. McMillan*, 566 F.2d 713, 720 (D.C.Cir.1977) (affirming a denial to amend a

pleading thirty-eight months after the filing of the complaint).

     Defendants' explanation for the delay—that a statute of limitations defense did not

become relevant until test plaintiffs' deposition testimony about the dates of their injury—is

nonsensical. First, the need to preserve a limitations defense should have been dramatically

*more* obvious before the crowd of over three thousand plaintiffs was narrowed down to twenty

test cases, not *less*. After all, the overwhelming majority of the thousands of Ecuadorians

alleging injuries beginning in December 2000 filed their claims in 2007-2008. (*See* Amended

Compl., April 3, 2008 [*Quinteros* ECF No. 23] at 6.)  The idea that defendants had no strategic

reason to preserve a limitations argument until they learned specific dates of injury from a

small group of twenty test plaintiffs is simply disingenuous.

Even though *Harris* is clear that prejudice is not required to deny a party's Rule 15

motion, *see Jones v. District of Columbia Dept. of Corrections*, 429 F.3d 276, 279 (D.C. Cir.

2005), the Court nonetheless finds prejudice here.  First, when plaintiffs proposed the twenty

test-plaintiffs in March 2009, they had received no fair notice that timeliness might be a

relevant issue in the litigation.  A party "must make strategic decisions about how to proceed,

and can plot its course adequately only if it can anticipate which issues will dispose of the case.

Failure to raise an affirmative defense in pleadings deprives the opposing party of precisely the

notice that would enable it to dispute the crucial issues of the case on equal terms."  *Harris*,

126 F.3d at 343.  Surely notice of defendants' intentions would have been a meaningful

consideration in selecting test plaintiffs whose injuries had occurred within the limitations

period for the various common law causes of action.  Second, defendants' excessive delay in

seeking leave to amend their Answer until after plaintiffs had pointed out the deficiency in their

Opposition cannot be excused.  Whether the delay was due to bad faith or innocent mistake,

defendants effectively forced plaintiffs to formulate a legal argument without knowing the full

state of play.

Finally, defendants argue that a Joint Status Report from September 2014 demonstrates

fair notice because it mentioned an impending, separate motion for summary judgment based

on a statute of limitations defense.  (Defs.' Reply at 18 n.41.)  Courts have found similar

attempts to show notice through alternative means outside the mechanisms of the Federal Rules

of Civil Procedure to be inadequate at best, and often, indications of undue delay and

gamesmanship. *See, e.g.*, *Bode & Grenier, LLP*, 808 F.3d at 861 (appellants' argument "that they gave fair notice of…[an affirmative] defense in deposition questions posed years before they filed the motion to amend…fails" and "proves only that…appellants had no reason to wait years before addressing those defenses in their answer"). Moreover, even if the Status Report *did* constitute fair notice to plaintiffs at best, it came three years after the close of discovery.

In short, defendants failed to raise the statute of limitations defense in their Answers, waited years before seeking permission to address that failure, and did not provide plaintiffs with sufficient notice to properly account for its viability. The Court denies defendants' Motion to Amend Their Answer, and consequently finds the test plaintiffs' claims to not be time-barred.[7]

## IV. BATTERY

In addition to challenging the timeliness of the test plaintiffs' claims, defendants also argue that there is insufficient evidence to satisfy the elements of test plaintiffs' remaining common law claims of Battery, IIED, and Nuisance. Plaintiffs respond that discovery has produced adequate evidence to suggest that there are genuine issues of material fact for a jury to weigh as to each cause of action. The Court considers the merits of each common law claim in turn.[8]

A battery is "an intentional act that causes harmful or offensive bodily contact." *Harris v. U.S. Department of Veterans Affairs*, 776 F.3d 907, 913 (D.C. Cir. 2015) (citing *Evans–Reid v. District of Columbia,* 930 A.2d 930, 937 (D.C. 2007)). The intent element is satisfied if the actor

---

[7] As a result of this conclusion, the Court need not consider the parties' arguments regarding the proper limitations period for plaintiffs' IIED claims or the availability of tolling.

[8] It is uncontested that D.C. law governs plaintiffs' three remaining common law claims.

realizes with "substantial certainty" that harmful or offensive contact will result from his conduct. Restatement (Second) of Torts § 18, cmt. e; *see also Konah v. District of Columbia*, 915 F.Supp.2d 7, 23 (D.D.C. 2013). Defendants argued at the hearing that the intent element would only be satisfied in this case by evidence that pilots were specifically targeting individuals on the ground with the motivation of hitting them with herbicide. (Oral Argument Tr. at 26.) This is not an accurate statement of the law. The intent element of Battery does not require purposeful intent to hit a specific person, but merely knowledge that harmful or offensive contact to somebody will occur with substantially certain probability. *Acosta Orellana v. CropLife Intern.*, 711 F.Supp.2d 81, 91 (D.D.C. 2010); *see also Roeder v. Atl. Richfield Co.*, 2011 WL 4048515, at *6 (D. Nev. Sept. 8, 2011) (discussing battery where plaintiffs alleged exposure to toxic substances that escaped a mine, the court found intent to be satisfied "where an actor subjectively desires no harm to any person at all, but believes that harmful consequences are substantially certain to befall *some person* as a result of his actions").

　　Thus, to satisfy the elements of battery in this case, DynCorp or its pilots must have: (1) known with substantial certainty (2) that the glyphosate herbicide being released was making bodily contact with test plaintiffs; and (3) that bodily contact was either offensive or harmful.

### A. Substantial Certainty

　　While "issues of intent often raise disputes over material fact that can best be resolved at trial, no special rules apply to state-of-mind questions. When a moving party meets the requirements of Rule 56, summary judgment will be granted." *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 49 (D.D.C. 2011). "[A] court must initially determine whether the plaintiffs' allegations, viewed in the light most favorable to the plaintiff, are minimally sufficient to show the existence of such intent.'" *Ross*, 362 F. Supp. 2d at 360 (alterations

13

omitted) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1078 (D.C. 1980)) (internal quotation marks omitted)).

   The Court finds that there are disputed issues of fact as to whether defendants were substantially certain that individuals would be contacted by the sprayed chemicals. DynCorp became aware that individuals in the Sucumbios province of the Ecuadorian borderlands were complaining of being sprayed by Plan Colombia pilots by September 2001, at the latest, when the *Arias* Complaint was filed. ████████████████████████

████████████████████████████████████████

████████████ (*See* Pls.' SUMF ¶ 19 ████████████

████████████████████████████████████ █████

████████████████████████████████████████

████████████████████████████████████

████████████ (*See, e.g.*, Pls.' SUMF ¶¶ 7-10; *id.* ¶ 11 (quoting Pls.' Opp., Ex. 1, at DEDP-00074634).) ████████████████████

████████████████████████████████████████

████████████ (*See* Pls.' Opp., Ex. 1, at DOS 3040; *see also id.* at DEMP 27174 ████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████



*(See, e.g.*, Pls.' Opp., Ex. 1, at DOS 32504.)

(Pls.' Opp., Ex. 1, at DEMP-172255.)

DynCorp themselves have admitted to seven specific missions that released spray in Ecuador between 2001 and 2004 (Defs.' Mot. at 4-5; Defs.' App., Dec. 15, 2014 [ECF No. 415-2] at 343-344), despite the fact that DynCorp had no contractual authorization or permission from the U.S. government to spray in Ecuador. (*See* Dep. of Randy Beers, Assistant Secretary of State for International Narcotics and Law Enforcement Affairs, at 21).

(Pls.' Opp., Exs. 12-15.)

Evidence shows not only proximity between spraying and test plaintiffs' homes, but also that pilots could clearly see the people, crops, and the ground below them when spraying. (Pls.' SUMF ¶ 19.) In addition, most of the test plaintiffs testified that the planes sprayed herbicide extremely close to their homes. (*See* Pl's SUMF ¶¶ 2, 4; SDMF ¶ 9.) Spraying chemicals in such close proximity to plaintiffs' properties suggests that the pilots themselves were

substantially certain of the consequences of their conduct. *See Werlein v. U.S.*, 746 F. Supp. 887, 907 (D. Minn. 1990) (because the defendant "disposed of highly toxic substances into sandy ground directly above a regional aquifer," there was "sufficient evidence that [it] knew that its conduct was substantially certain to cause an offensive or harmful contact to preclude summary judgment").



*(See, e.g.,* Pls.' Opp., Ex. 1, at DEMP-100489

(Pls.' Opp., Ex. 1, at DEMP-115700.)

Defendants respond that, to the extent that individuals were contacted by spray, pilots were not intentionally spraying individuals below them; instead, herbicide "drift" from wind patterns was to blame. There are two problems with this argument. First, DynCorp employees and pilots appear to have consciously and routinely ignored the operational parameters set specifically so that spray would *not* drift outside spray zones



(Pls.' Opp., Ex. 1, DEMP-168106

(*See, e.g.*, Pls.' SUMF ¶ 8.)  Second, at this stage of litigation, it is difficult—without more

facts—to isolate those test plaintiffs who may have been sprayed as a result of "drift" incidents

from those who were directly sprayed by pilots flying overhead.

In sum, the Court finds sufficient evidence to support the contention that DynCorp

understood the troubling consequences of its spray operations in Ecuador.  There is thus a

material factual dispute as to whether defendants and their pilots were "substantially certain"

that herbicide was routinely contacting individuals on the ground in Ecuador.

### B.  Bodily Contact

Clearly there can be no battery where there is no evidence of physical contact between

the herbicide spray and a test plaintiff.  *See Dingle v. Dist. of Columbia*, 571 F. Supp. 2d 87, 98

(D.D.C. 2008) ("In view of the centrality of offensive touching to the tort of battery, summary

judgment is appropriate where the plaintiff fails to allege she was offensively touched.").

Although plaintiffs assert that fourteen of the original twenty plaintiffs alleged that spray touched their bodies (Pl's Opp. at 23), the Court finds that only nine of the test plaintiffs (including the now-deceased Edgar Sandoval) testified to bodily contact.[9]  Because the Court finds no evidence of bodily contact for the remaining eleven test plaintiffs, their battery claims do not survive summary judgment.[10]

### C.  Offensiveness

Whether bodily contact qualifies as "offensive" follows an objective reasonableness standard.  Restatement (Second) of Torts § 19 ("A bodily contact is offensive if it offends a reasonable sense of personal dignity.").  It therefore matters less whether the test plaintiffs found the spray on their body to be offensive, as opposed to whether the jury would find the contact reasonably offensive. *See Evans v. Washington Ctr. for Internships and Academic Seminars*, 587 F. Supp. 2d 148, 150-51 (D.D.C. 2008) (finding "defendants' argument that the contact could not possibly be construed as harmful or offensive . . . is also a factual question").

In the Court's view, having one's body sprayed with chemicals could constitute offensive bodily contact to a reasonable juror.  It is instructive that the Restatement uses an example of being splashed with "a few drops of dirty water"—a much less objectively offensive bodily contact than being covered in glyphosate herbicide by overhead planes—as a

---

[9] The following nine test plaintiffs alleged in sworn testimony that the spray touched their skin: Victor Mestanza (Dep. Tr. at 68), Jorge Salas (Dep. Tr. at 26-27, 40-41, 58), Lauren Sanchez (Dep. Tr. at 40, 79, 80), John Salas (Dep. Tr. 34-35), Dociteo Sandoval (Dep. Tr. at 41, 67), Wilber Sandoval (Dep. Tr. at 25, 26, 34, 35), Edgar Sandoval (Dep. Tr. at 22, 41, 43), Elvia Alvarez (Dep. Tr. at 33-34), and Edgar Balcazar (Dep. Tr. at 40).

[10] The following eleven test plaintiffs never testified to having been touched by the herbicide, and thus defendants' motion for summary judgment is granted with respect to their battery claims: Santos Calero, Calixta Pineda, Betty Calero, Yuli Calero, Edy Mestanza, Jennifer Mestanza, Ercilia Bosquez, Rosa Altamirano, Luciano Quevedo, Edith Quevedo, Robinson Quevedo.

textbook example of battery. Restatement (Second) of Torts § 18, cmt. g ("A throws dirty

water from his window at B who is walking on a street below. A few drops fall on B's hand

but do him no bodily harm. A is subject to liability to B."); *id.* § 18, cmt. c (one is liable for

battery "if he throws a substance such as water, upon the other"); *see also U.S. v. Gomez*, 690

F.3d 194, 211 (4th Cir. 2012).

The Court is not persuaded by defendants' reliance on two West Virginia cases, in

which the court did not find battery based on plaintiffs' exposure to chemicals. (Defs.' Mot. at

20 (citing *McClenathan v. Rhone-Poulenc, Inc.*, 926 F. Supp. 1272 (S.D. W. Va. 1996);

*Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 756, 773 (S.D. W. Va. 2009).)

Unlike the District of Columbia, West Virginia does not recognize battery based on offensive

contact alone. *See Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 95 (4th Cir. 2011)

(citing *Funeral Servs. by Gregory, Inc. v. Bluefield Comm. Hosp.*, 186 W. Va. 424 (1991)

(refusing to embrace a definition of battery that does not require "actual physical

impairment"). By contrast, a Kentucky case found that coal dust contacting the skin of the

plaintiffs could constitute battery, since in Kentucky, battery "is an offense against the dignity

of the plaintiff [and thus] neither physical injury nor actual damage must be proved." *Barnette

v. Grizzly Processing, LLC*, 809 F. Supp. 2d 636, 647-648 (E.D. Kty. 2011) (citing 13 Ky.

Prac. Tort Law § 2:1 (2010)). That is not the case here. As the Court of Appeals noted in its

opinion in this case, the very reason that the test plaintiffs' battery claims survived was

because battery "requires a showing of a harmful *or offensive* touching." *Arias*, 752 F.3d at

1017 (emphasis in original) (citing *Evans*, 587 F. Supp. 2d at 150).

The Court therefore grants defendants' Motion for Summary Judgment as to the battery

claims of the eleven test plaintiffs who did not provide evidence of bodily contact with the spray, but denies it with respect to the battery claims of the remaining nine.[11]

## V.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

Intentional infliction of emotional distress requires "extreme and outrageous conduct on the part of the defendant which intentionally or recklessly causes the plaintiff severe emotional distress." *Konah*, 916 F. Supp. 2d at 22 (D.D.C. 2013). For the test plaintiffs' IIED claims to survive summary judgment, they must demonstrate some material dispute of fact as to each of the following elements: (1) defendants' recklessness, (2) defendants' extreme and outrageous conduct, and (3) severe emotional distress caused by defendant.

### A.   Recklessness

Recklessness is a lower threshold of mens rea than the "substantial certainty" standard of intent required to satisfy battery. Whereas defendants are only liable for battery if DynCorp or its Plan Colombia pilots realized with substantial certainty that they were dumping herbicide on plaintiffs, they need only have consciously disregarded the risks of their spraying to meet the recklessness element of IIED. *In re Romansky*, 938 A.2d 733, 740 (D.C. 2007).

Thus, DynCorp's recklessness can be inferred from the conduct already outlined in Part IV.A. *See Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (holding that recklessness may be inferred from one's conduct). The record can be read to reflect a consistent pattern of reckless behavior by DynCorp and its pilots. Defendants were repeatedly informed that their pilots were spraying chemicals on communities in Ecuador—at the latest, by September 2001— yet continued to carry out spray operations in a manner that deeply troubled Ecuadorian

---

[11] Although Edgar Sandoval provided sufficient evidence of battery, his complaint will be dismissed, following his death. *See* note 3, *supra*.

population centers, the United States government, and employees within DynCorp itself.

████████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████   (Pls.'

SUMF ¶¶ 2-7, 20-29; SMDF ¶ 9; *see also* Pls.' SUMF ¶ 8 (The record suggests that more than

75,000 spray flights broke speed parameters, over 16,000 sprayings occurred above the

maximum spray height, and more than 27,000 sprayings were in violation of the spray mix

application rate).)[12]

In short, there is ample evidence to suggest that DynCorp and its pilots simply ignored

(and sometimes mocked) the fact that plaintiffs from specific areas of Ecuador were

complaining about the company's sloppy spraying flights. They were repeatedly informed of

systemic problems with the Plan Colombia missions and dangerous incidents, yet consciously

chose to not meaningfully address them, despite the clear and obvious risks to people and

property on the ground. There is no question that plaintiffs have presented sufficient evidence

of recklessness to survive summary judgment.

**B. Outrageousness**

In determining whether reckless conduct is outrageous, "the court must consider the

specific context in which the conduct took place." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d

158, 163 (D.C. 2013). DynCorp's decision to continue to spray missions spraying border

communities in Ecuador for years after it was told that such spraying was causing harm

aggravated what already amounts to troubling conduct. *Waldon*, 415 A.2d at 1077

(outrageousness for an IIED claim may be inferred "when the defendant has information that

---

[12] For more evidence demonstrating defendants' recklessness, see Part IV.A, *supra*.

plaintiff's health is being adversely affected by his actions and nonetheless fails to desist"). Defendants rely upon *Plourde v. Gladstone,* 69 Fed.Appx. 485 (2d Cir. 2003), in which the Second Circuit determined that the defendant's accidental spraying of herbicide on a neighbor's property was not outrageous; yet the court in *Plourde* deemed it critical that there had been no complaints of herbicide drift in prior years, and the defendant specifically chose an herbicide with a lower propensity to drift. *Id.* at 488. In this case, defendants were repeatedly informed of the damage they were doing and willfully refused to address the problems with pilots who were disobeying the drift parameters.

The fact that plaintiffs include impoverished farmers who rely on their land to survive and defenseless children make defendants' recklessness all the more outrageous. *See Drejza v. Vaccaro*, 650 A.2d 1308, 1309 (D.C. 1994) (holding "the outrageousness determination must be made with [the plaintiff's] special circumstances in  mind"). The test plaintiffs were obviously "more susceptible [to emotional distress] than a member of the public at large." *Id.* at 1314. The jury should be allowed to decide if the evidence presented, viewed in context of the test plaintiffs' vulnerability, rises to the level of outrageousness. *Drejza*, 650 A.2d at 1316 ("If reasonable people may differ as to whether, given [the plaintiff's] condition and  circumstances, [the defendant's] conduct was outrageous . . . the issue must be left to the jury.").

Finally, defendants violated U.S. government policy by disobeying clear reprimands by the Department of State and spraying territory in Ecuador, where DynCorp's pilots had no legal right to conduct operations. *See Best*, 484 A.2d at 986 ("Actions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress.").

### C. Severe Emotional Distress

Under D.C. law, an IIED claim generally requires a plaintiff's distress to be so intense that there is some physical manifestation of the emotional turmoil. *See* Restatement (Second) of Torts § 46 cmt. k (1965) ("Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe."); *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164 (D.C. 2013) (requiring emotional distress "of so acute a nature that harmful physical consequences might be not unlikely to result"). If a plaintiff is merely sad or upset by an event, that does not constitute severe emotional distress. If, however, an individual's emotional shock permanently alters their daily activities, changes their personality, destroys their ability to live or sleep comfortably, or overwhelms the person with stress or depression, such physical impacts may suffice under D.C. law. *See Dammarell v. Islamic Republic of Iran,* 404 F. Supp. 2d 261, 275 (D.D.C. 2005) (citing "various emotional conditions [that] can support an award of compensatory damages for IIED," including depression, stress, and personality changes); *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C. 1988) (affirming mental distress award where the plaintiff had "feelings of violation, anxiety, and helplessness which disrupted his activities and disturbed his sleep over a period of several weeks," underwent a negative personality change, and "drank more"); *Homan v. Goyal*, 711 A.2d 812, 821 (D.C. 1998) (the plaintiff "was driven from his home for a month in fear for his life, . . . missed a day of work, . . . found it difficult to concentrate when he was at work, and . . . had no idea when and if his ordeal was going to end").

In this case, some of the test plaintiffs claim to have suffered severe emotional distress from the anxious experience of DynCorp's planes spraying their property or body with glyphosate herbicides. As the D.C. Circuit expressly recognized in this case, "a plaintiff might

be quite reasonably distressed at being sprayed with an unknown substance." 752 F.3d at 1018 n.3. It is important to distinguish physical harm *arising as a manifestation* of the emotional distress, shock, and fearful experience of being sprayed, from the physical harm and property damage directly *caused by* the glophosate spray. Whereas the latter type of physical harm required plaintiffs to provide expert testimony as to general causation (which they failed to do), the former is a necessary element of test plaintiffs' surviving IIED claims. Of the original twenty test plaintiffs, five testified to suffering acute emotional distress that included physical signs of severity, while fifteen did not.[13] A large number of test plaintiffs provided declarations attesting to how they were emotionally distressed as a result of their physical injuries, damaged crops, and resulting economic difficulties. (*See, e.g.*, Decl. Edgar Balcazar; Decl. Edith Quevedo; Decl. Calixta Pineda.) These types of emotional anxiety are not sufficiently severe as a matter of law. By contrast, Elvia Alvarez, Victor Mestanza, Luciano Quevedo, Rosa Altamirano, and Dociteo Sandoval all testified to some type of physical manifestation of their distress, whether that be a changed personality, depression, or loss of sleep.

The Court therefore denies defendants' Motion for Summary Judgment as to the five aforementioned test plaintiffs' IIED claims, and grants it as to the IIED claims of the other fifteen.

---

[13] The following five test plaintiffs testified to suffering severe emotional distress: Elvia Alvarez, Victor Mestanza, Luciano Quevedo, Rosa Altamirano, and Dociteo Sandoval. By contrast, the other fifteen test plaintiffs did not provide sufficient testimony of severe emotional distress: Santos Calero, Calixta Pineda, Betty Calero, Yuli Calero, Edy Mestanza, Jennifer Mestanza, Ercilia Bosquez, John Salas, Jorge Salas, Lauren Sanchez, Wilber Sandoval, Edgar Sandoval, Edith Quevedo, Robinson Quevedo, and Edgar Balcazar.

## VI.  NUISANCE

Defendants argue that the test plaintiffs' nuisance claim fails as a matter of law for two reasons: first, because the D.C. Court of Appeals has ruled that "[n]uisance ordinarily is not a separate tort in itself but a type of damage so that a plaintiff seeking to recover on a nuisance theory must allege and prove some sort of tortious conduct." *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, at 167, 168 (D.C. 2013); and second, because the alleged sprayings were too sporadic and isolated in time to constitute a nuisance, which generally must be continuous and permanent in character. (Defs.' Mot. at 11-12.)

Because the Court has found sufficient evidence to support two other types of tortious conduct, defendants' first argument—that nuisance is not recognized as a separate tort under D.C. law—is largely irrelevant.  In any event, the Court agrees with defendants' alternative point.

To qualify as a nuisance under D.C. law, "the offending thing must be marked by some degree of permanence such that the continuousness or recurrence of the things, facts or acts which constitute the nuisance, give rise to an unreasonable use." *Ortberg*, 64 A.3d at 168.  The *Ortberg* court concluded that the plaintiff's allegations in *Ortberg* of five demonstrations at the plaintiff's home and eight demonstrations at  his office over a period of several weeks was insufficiently continuous to create a nuisance.  *Id.*  The test plaintiffs' nuisance claims are based on far more sporadic conduct.  None of the original twenty test plaintiffs claims to have suffered anything resembling an extended period of continuous spraying.  Their descriptions instead generally reflect isolated, memorable incidents that occurred between one and a handful of times over multiple years.  Nor do they claim to have suffered injuries from the battery and IIED torts

that have created "substantial harm flowing from some degree of permanence with regard to the [DynCorp defendants'] actions." *Ortberg*, 64 A.3d at 168.[14]

## CONCLUSION

For the reasons discussed above, defendants' Motion for Summary Judgment is granted in part and denied in part.  A separate Order accompanies this Memorandum Opinion

/s/  *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 23, 2016

---

[14] Had the D.C. Circuit not affirmed the dismissal of all common law claims relating to property damage and physical injury, plaintiffs would have a far easier time satisfying this "permanent harm" requirement through their claims of property damage and physical injury.  Emotional distress and offensive bodily contact are not viable expressions of permanence.